## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID BROWN, SR.<br>4632 N. 13th Street<br>Philadelphia, PA 19140 | : <br> : <br> : <br> : <br> NO.: 2:16-cv-04746-GAM |
|           Plaintiff, | : |
|           v. | : |
| COILPLUS-PENNSYLVANIA, INC.<br>5135 Bleigh Avenue<br>Philadelphia, PA 19136 | : <br> : <br> : <br> : |
| And | : <br> : |
| UNITED STEEL, PAPER & FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO, CLC, LOCAL UNION #4889-08<br>10 Canal Street, Suite 310<br>Bristol, PA 19007 | : <br> : <br> : <br> : **JURY TRIAL OF TWELVE (12)** <br> : **JURORS DEMANDED** <br> : <br> : |
| And | : <br> : |
| UNITED STEEL, PAPER & FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO, CLC<br>60 Boulevard of the Allies<br>Five Gateway Center, Suite 807<br>Pittsburgh, PA 15222 | : <br> : <br> : <br> : <br> : <br> : <br> : |
| And | : <br> : |
| JOHN DOES | : <br> : |
|           Defendants. | : |

FILED

NOV 16 2016

LUCY V. CHIN, Interim Clerk
By _____ Dep. Clerk

## FIRST AMENDED CIVIL ACTION COMPLAINT

NOW COMES the Plaintiff, David Brown, Sr. (hereinafter "Plaintiff"), by and through his attorneys at Hopkins & Schafkopf, LLC and Weisberg Law, in complaint against the Defendants CoilPlus-Pennsylvania, Inc., United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Local Union #4889-08, United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC and John Does (collectively, hereinafter "Defendants"), and states as follows:

## I. NATURE OF ACTION

1. This action arises out of a violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce, pursuant to 29 U.S.C.A. §185; see also *Vaca v. Sipes*, 87 S.Ct. 903 (1967).

## II. JURISDICTION AND VENUE

2. Jurisdiction in this Honorable Court is based on a violation of federal law conferred by 28 U.S.C. § 1331.

3. Venue lies in the district in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, and/or business here, and/or the property which is the subject of this action is situated within this district.

4. This action arises out of a violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce, pursuant to 29 U.S.C.A. §185, of which a copy of the Collective Bargaining Agreement entitled Collective Bargaining Agreement Between CoilPlus Pennsylvania and United Steel, Paper & Forestry, Rubber, Manufacturing, Energy Allied Industrial & Service Workers International Union, AFL-CIO-

CLC, Local Union #4889-08, effective: February 1, 2015, is attached and incorporated herein as Exhibit A.

### III. PARTIES

5.     Plaintiff, David Brown, Sr., resides at the above captioned address.

6.     Defendants, United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Local Union #4889-08 and United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively the "Union"), are a Union who has a collective bargaining agreement with CoilPlus-Pennsylvania, Inc. with their principal place of business located at the above captioned addresses.

7.     Defendant, CoilPlus- Pennsylvania, Inc., ("CoilPlus") is a foreign corporation, doing business in the state of Pennsylvania at the above captioned address.

8.     At all times relevant, Plaintiff was a member in good standing of the Union.

### IV. OPERATIVE FACTS

9.     Plaintiff began working worked for CoilPlus starting on or about August 3, 2011 until his termination on March 4, 2016.

10.     Plaintiff was a member of the Union beginning on or about August 3, 2011 and paid ongoing membership fees.

11.     In the spring of 2013, Plaintiff became Assistant Operator at his plant. This required him to set up the next job for the next operator or to put coils on the machine.

12.     In early December of 2015, Plaintiff was given a temporary job title as Head Setter. This job title required Plaintiff to set up cuts for individual companies, set-up slits, and "shimming" little rings.

13.    A few days after starting the temporary position as Head Setter, Plaintiff informed his plant supervisor, Mike Onody, and head supervisor, Richard Gorman, that he was unable to work at this title efficiently. The "shimming" of the little rings was confusing to Plaintiff and he knew with certainty that he was going to make a few mistakes.

14.    Onody informed Plaintiff it was just a temporary position and Plaintiff would be at his usual position in no time.

15.    The temporary job title was supposed to be thirty (30) days per the Collective Bargaining Agreement. See page 26 of Exhibit A.

16.    The reason Plaintiff was chosen to fill this temporary position was because he had previously worked and trained as Head Setter.

17.    Plaintiff's position as an Assistant Operator paid more than the title of Head Setter. Because it was just a temporary position, Plaintiff's income was not affected.

18.    As previously mentioned, during that thirty (30) days, Plaintiff informed Onody and Gorman he would not be able to perform to the best of his abilities as Head Setter.

19.    The reason Plaintiff knew he would not be able to perform to the best of his abilities was because of stress induced reasons.

20.    Close to the end of the thirty (30) days, Plaintiff was instructed by Onody that he had to remain in as temporary Head Setter for another six (6) to eight (8) weeks.

21.    Plaintiff had to stay in the temporary position for a longer period of time because CoilPlus failed to train a new employee for the position.

22.    It is the company's duty to train personnel for positions that are being temporarily filled.

23.     Plaintiff informed Onody about four (4) to five (5) separate times after the thirty (30) days that he was unable to stay as a temporary Head Setter due to personal reasons he knew would take a toll at work.

24.     Onody did not care to listen Plaintiff and insisted on the fact that the company was unable to train someone or have someone else fill the position temporarily.

25.     Plaintiff knew there was another gentleman who was supposed to be trained as Head Setter, but instead was asked to perform another job at the plant. There were also many other employees at the plant who knew how to perform the tasks as Head Setter.

26.     On January 29, 2016, Plaintiff made his first mistake as Head Setter.

27.     Plaintiff was told he received a verbal warning. However, according to CoilPlus Pennsylvania Disciplinary Form, it was a "written warning." Exhibit B.

28.     A few days later on February 3, 2016, Plaintiff made another mistake at work. He was told this was another verbal warning.

29.     On the CoilPlus Pennsylvania Disciplinary Form, it does not indicate whether or not the warning was verbal or not. The form does state that if Plaintiff has any further occurrence within the next twelve (12) months, he will be terminated. Exhibit C.

30.     On that same day, February 3, 2016, Plaintiff requested a "Leave of Absence" form from his second shift supervisor, Tom Yaneralla.

31.     Plaintiff wanted to file a leave of absence because he knew his stress had not gotten any better. On the contrary, with what was happening at work, it made it worse. Plaintiff wanted to get himself out the situation since Onody was not helping.

32.     Plaintiff was aware leave of absences are not paid. However, Plaintiff was going to receive permission from his doctor which would then allow him to have a paid leave of absence.

33.     Plaintiff is a single parent so he did not want to run the risk of losing any income for his family.

34.     On February 5, 2016, Plaintiff made his final mistake at work.

35.     According to the CoilPlus Pennsylvania Disciplinary Form, Plaintiff was suspended five (5) days pending termination. Exhibit D.

36.     Plaintiff was informed that someone from the Union would contact him after the February 5, 2016 incident.

37.     About two (2) weeks later, a union representative from International Union of United Steel Workers contacted Plaintiff. They gave him two (2) options: forget the job and collect unemployment; or attend a hearing. They informed Plaintiff that he was unable to collect unemployment during arbitration. Plaintiff wanted to fight for his job and ultimately requested a hearing.

38.     The hearing was held on February 25, 2016.

39.     Before the hearing began, Onody asked Brian Martin, President of the Union at the plant, if they should wait for Plaintiff's union representative. However, without any rationale or strategic reasons, Martin arbitrarily told Onody not to wait for Plaintiff's union representative. Martin knew or should have known that he is not allowed to represent employees at the plant and would be emotionally unfit to represent Plaintiff. HOLDER

40.     Plaintiff, Onody, and Martin were the only parties in the hearing.

41.     The hearing began with Martin insisting Onody should have listened to Plaintiff in the first instance when Plaintiff told Onody that he was unfit to work in the temporary position.

42.     Onody then accused Plaintiff of making mistakes on purpose.

43.    The meeting then became an exchange of inappropriate language between Onody and Martin. The two men were attacking each other on how they both handle their business.

44.    Martin made a remark that CoilPlus "does this kind of stuff to employees all the time." This is insinuating employees are mistreated regularly in these kinds of matters.

45.    The hearing ended abruptly without Martin affectively arguing Plaintiff's matter. If Martin had waited for Plaintiff's union representative and not arbitrarily decide to continue without him, Plaintiff may have succeeded in retaining his position.

46.    On Friday, March 4, 2016, Plaintiff was told he lost his hearing and was terminated.

47.    On Monday, March 7, 2016, Plaintiff talked to a former co-worker, Duane Robinson, who was familiar with the Collective Bargaining Agreement. Robinson informed Plaintiff that Plaintiff was improperly represented at his February 25, 2016 hearing. Specifically, Robinson told Plaintiff that Martin was not allowed to represent him in the hearing. Robinson also informed Plaintiff that he was misled; i.e. that he was allowed to collect unemployment during the arbitration process.

48.    Following the conversation with Robinson, Plaintiff contacted Gorman to receive a copy of the Collective Bargaining Agreement.

49.    On or about March 9, 2016, Plaintiff met with Gorman at the workplace and obtained a copy of the Collective Bargaining Agreement. Gorman informed Plaintiff, "You were not properly represented at the hearing... You should sue."

50.    Plaintiff was also informed that he was on "watch," speculating that Plaintiff's termination was planned and under false pretenses.

51.    During the February 25, 2016 meeting, Plaintiff was deprived of his union rights to receive fair and adequate union representation. Plaintiff learned of the deprivation during the

March 7, 2016 conversation with Robinson and obtained the supporting documentation on March 9, 2016.

V.    **COUNTS OF ACTION**

## COUNT I
### Breach of Duty of Fair Representation
*Plaintiff v. the Union*

52.    The foregoing paragraphs are fully incorporated herein as though set forth at length.

53.    At all times material, Plaintiff's employment with CoilPlus was subject to a collective bargaining agreement ("CBA").

54.    Plaintiff was entitled to fair and actual representation from the Union.

55.    The Union breached the CBA by not providing fair and actual representation during any of the meetings held to defend Plaintiff on the accusations being made against him.

56.    As a result of the Union's breach of the CBA, Plaintiff sustained significant economic loss.

WHEREFORE, Plaintiff requests this Court:

    i.    Find that the Union has violated applicable law, reinstate Plaintiff in his position with CoilPlus, award Plaintiff compensatory damages to compensate him for his damages, including, but not limited to, back wages, front wages, employee benefits, and other emoluments of employment, with interest as permitted;

    ii.    Award attorneys' fees and costs arising out of this action; and

    iii.    Grant any other relief this court deems equitable and just.

## COUNT II
### Breach of Collective Bargaining Agreement
*Plaintiff v. CoilPlus*

57.    The foregoing paragraphs are fully incorporated herein as though set forth at length.

58.     CoilPlus has a duty to honor the Collective Bargaining Agreement with the Union and Plaintiff. *See generally Vaca v. Sipes,* 386 U.S. 171, 177-179 (1967).

59.     CoilPlus breached the Collective Bargaining Agreement with the Union and Plaintiff by the following acts and omissions:

      a.     Suspended and terminated the employment of Plaintiff without just cause;

      b.     Suspended and terminated the employment based on false facts and missing relevant information;

      c.     Failed to adequately investigate the facts and circumstances prior to suspending and terminating the employment of Plaintiff;

      d.     Failed to allow Plaintiff to adequately address the false facts and allegations, which were the alleged basis for the suspension and termination of Plaintiff's employment;

      e.     Failed to follow the grievance procedures provided in the Union CBA with CoilPlus; and

      f.     Wrongfully suspended and terminated the employment of Plaintiff.

WHEREFORE, Plaintiff requests that this Court:

      i.     Find that CoilPlus has violated applicable law and award to Plaintiff compensatory damages to compensate him for damages, including but not limited to, back wages, front wages, employment benefits, and other emoluments of employment;

      ii.     Award attorneys' fees and costs arising out of this action; and

      iii.     Grant any other relief this court deems equitable and just.

**WEISBERG LAW**

*/s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esquire
L. Anthony DiJiacomo, Esquire
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

DAVID BROWN, SR.           :
                            :
          Plaintiff,         :    NO.:   16-4746
                            :
        v.                   :
                            :
COILPLUS-PENNSYLVANIA, INC., et al. :     **JURY TRIAL DEMANDED**
                            :
          Defendants.     :

## CERTIFICATE OF SERVICE

I, Matthew B. Weisberg, Esquire, hereby certify that on this 15th day of November, 2016,

a true and correct copy of the foregoing Plaintiff's Fist Amended Civil Action Complaint was

served via regular mail upon the following parties:

Jonathan Landesman, Esq.
Joshua A. Brand, Esq.
Cohen Seglias Pallas Greenhall & Furman, P.C.
United Plaza, 19th Floor
30 S. 17th St.
Philadelphia, PA 19103

Debra A. Jensen, Esq.
Michael W. McGurrin, Esq.
Galfand Berger, LLP
1835 Market St., Suite 2710
Philadelphia, PA 19103



FILED

NOV 1 6 2016

LUCY V. CHIN, Interim Clerk
By _____Dep. Clerk

### WEISBERG LAW

*/s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esquire
L. Anthony DiJiacomo, Esquire
*Attorneys for Plaintiff*

# EXHIBIT A

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

COILPLUS PENNSYLVANIA

and

UNITED STEEL, PAPER & FORESTRY,
RUBBER, MANUFACTURING, ENERGY
ALLIED INDUSTRIAL & SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO-CLC

LOCAL UNION # 4889 - 08



Effective: February 1, 2015

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1 | INTENT & PURPOSE | 1 |
| Article 2 | RECOGNITION | 1 |
| Article 3 | NO DISCRIMINATION | 2 |
| Article 4 | MANAGEMENT RIGHTS | 2 |
| Article 5 | WAGES | 3 |
| Article 6 | HOURS OF WORK | 4 |
| Article 7 | OVERTIME | 7 |
| Article 8 | GRIEVANCE AND ARBITRATION PROCEDURE | 9 |
| Article 9 | SUSPENSION & DISCHARGE | 12 |
| Article 10 | UNION VISITATION | 13 |
| Article 11 | VACATIONS | 13 |
| Article 12 | SENIORITY | 15 |
| Article 13 | PROBATIONARY EMPLOYEES | 16 |
| Article 14 | HOLIDAYS | 16 |
| Article 15 | SAFETY COMMITTEE, SAFETY & HEALTH | 18 |
| Article 16 | SAFETY SHOES & SAFETY EQUIPMENT | 19 |
| Article 17 | LEAVES OF ABSENCE | 19 |
| Article 18 | INSURANCE | 20 |
| Article 19 | NO STRIKE - NO LOCKOUT | 23 |
| Article 20 | PERFORMANCE OF WORK BY NON-BARGAINING UNIT EMPLOYEES | 23 |

| Article 21 | BEREAVEMENT PAY | 24 |
| Article 22 | JURY DUTY | 24 |
| Article 23 | MONTHLY MEETINGS | 25 |
| Article 24 | UNION SHIFT REPRESENTATIVE & GRIEVANCE COMMITTEE | 25 |
| Article 25 | BULLETIN BOARDS | 25 |
| Article 26 | TEMPORARY VACANCIES AND JOB BIDDING | 26 |
| Article 27 | REDUCTION OF THE WORKFORCE AND LAYOFFS | 31 |
| Article 28 | TEMPORARY AND CASUAL EMPLOYEES | 31 |
| Article 29 | SICK DAY | 33 |
| Article 30 | PERFECT ATTENDANCE AWARD | 33 |
| Article 31 | GRACE PERIOD | 33 |
| Article 32 | PROFIT SHARING PLAN | 34 |
| Article 33 | 401(k) PLAN | 34 |
| Article 34 | UNIFORMS | 34 |
| Article 35 | TERM OF AGREEMENT | 35 |
| EXHIBIT A | | 36 |
| EXHIBIT B | | 38 |

# AGREEMENT

THIS AGREEMENT, dated February 1, 2015, is entered into between the Coilplus Pennsylvania (hereinafter referred to as the "Company") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, (hereinafter referred to as the "Union") on behalf of Local Union #4889-08.

## ARTICLE 1 - INTENT AND PURPOSE

Negotiations concluded, the purpose of the parties hereto is to set forth their entire Agreement covering conditions of employment, wages, hours, and benefits. This Agreement supersedes and negates all past or future written, verbal or tacit understandings, practices and agreements unless such matter is in writing and executed by the appropriate officials of the Union and the Company.

## ARTICLE 2 - RECOGNITION

Section 1 - The Company recognizes the United Steelworkers of America as the sole Collective Bargaining Representative for all production and maintenance employees including receiving, shipping, and material handling, who are employed at its Milnor & Bleigh Streets, Philadelphia, Pennsylvania location, excluding all sales, professional, office and clerical employees, guards and supervisors as defined in the Act.

Section 2 - All employees as defined in Article II, Section 1, shall become and remain members in good standing in the Union thirty (30) days following the effective date of this Agreement or from the beginning-of their employment, whichever is later, and shall remain members of the Union in good standing as a condition of their employment. All new employees, as a condition of employment shall become and remain members of the Union in good standing beginning on the 30th day following the date of employment.

Section 3 - It is agreed that the Union initiation fee and monthly dues, in amounts as authorized shall be deducted from the pay of each employee, who has worked at least five (5) days in the preceding month, upon written authorization to the Company by each individual employee. Such deductions shall be made from the first pay of each month for the preceding month. All initiation fees and dues so deducted shall be promptly remitted by the Company to the International Treasurer of the Union.

> (a)     The Company further agrees to forward a list of all bargaining unit employees, including hirees and terminations, once a month to the Financial Secretary of the Local Union; and that the transmittal of the said list shall be simultaneous with the transmittal of the aforementioned deductions. Such list shall indicate which of the employees, whose

name appears thereon, did or did not pay:

> (1) regular dues
> (2) initiation fees.

(b)     Applicable deductions shall be made from the payment due to any employee who shall be out of the plant at the time of the specified dues deduction date of any month and who received a pre-payment of wages applicable to the absence.

Section 4 - The sole authorized representative of the Union, for the purpose of certifying any change in monthly dues or initiation fees which may be levied, and which are to be deducted by the Company, shall be the International Secretary-Treasurer.

Section 5 - The Union shall indemnify and save the Company harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken or not taken by the Company for the purpose of complying with any of the provisions of this Article.

## ARTICLE 3 - NO DISCRIMINATION

Section 1 - The Company and the Union agree that they will not discriminate against any employee, or group of employees, because of sex, race, color, creed or national origin.

## ARTICLE 4 - MANAGEMENT RIGHTS

Section 1 - All the functions, powers or authority which the Company has not specifically abridged, delegated, or modified by this Agreement will be recognized by the Union as being retained by the Company.

Section 2 - The Union recognizes that there are functions, powers, and authorities belonging solely to the Company, prominent among which, but by no means wholly inclusive, are the functions of introducing new or improved production methods of operation and/or equipment, deciding the character, design, structure and engineering and number and location of facilities, the nature of and mode of using equipment or machinery, the method of training employees.

Section 3 - Subject to the provisions of this Agreement, there shall be no interference with the following functions of the Company:

> (a)     To enforce such reasonable rules and regulations as it may deem necessary and proper to the conduct of its business, except that changes in existing rules and regulations shall be arrived at by mutual agreement of the Company and the Union.
> (b)     To permanently relocate, eliminate, change, or consolidate plants, equipment, departments, jobs, classifications or work sites.

> (c)     To operate one or more departments, jobs, sections, or divisions while others are closed down; and to control absolutely the volume of its production and the allocation of

α

(1)    (A) Shift is scheduled to commence at 7 a.m. and end at 3 p.m.

(2)    (B) Shift is scheduled to commence at 3 p.m. and end at 11 p.m.

(3)    (C) Shift is scheduled to commence at 11 p.m. and end at 7 a.m.

Section 4 - Fifty cents ($.50) per hour shift premium will be added to the hourly rate of each employee working on "B" Shift. Forty cents ($.40) per hour shift premium will be added to the hourly rate of each employee working on "C" Shift.

(a)    Where an employee works overtime which is consecutive to the employee's regular shift (either before or after such shift) and the employee receives a shift premium for such regular hours of work, the employee will receive one and one-half times his regular base rate of pay (including the shift premium) for such overtime regardless of whether or not such overtime hours fall during any part of a shift that would otherwise pay a shift premium. If, however, the employee's regular shift does not provide for a shift premium, then the employee will not be entitled to a shift premium for the overtime work regardless of whether the overtime hours fall on a shift which would otherwise provide a shift premium.

(b)    Where an employee works overtime on a shift which is not consecutive (either before or after) to his regular shift, such as Saturday or Sunday work, such employee will be entitled to a shift premium only if the hours worked on such Saturday or Sunday fall on a shift which, pursuant to this Agreement, pays a shift premium.

(c)    Where an employee works a split shift (a consecutive shift that falls partially on one designated shift and partially on another designated shift) the employee will be entitled to a shift premium for all hours worked on such shift including overtime hours only if four or more of the employee's regular straight time hours on such split shift fall during a regular shift which provides for a shift premium.

Section 5 - Where possible, paychecks will be distributed on first and third shift prior to the lunch break on such shift on Thursday and to the second shift by 7:30 pm on Wednesday evening.

Section 6 - Where, in the Company's opinion, it is necessary to train an employee for a particular job under the provisions of Article 26, Section 11 and an experienced bargaining unit employee is assigned to function as a trainer, the employee performing the training will receive a premium of $8.00 per day. The training premium is not applicable to retraining that may be required to maintain an "X" under Exhibit B (5).

## ARTICLE 6 - HOURS OF WORK

Section 1 - Eight (8) hours shall constitute a regular day's work and forty (40) hours shall constitute a regular week's work, but this shall not be construed as a guarantee of hours of work in any

one day or in any one week. The work week shall consist of seven (7) consecutive days beginning with the third shift on Sunday night (which shall be considered as a Monday shift). A work day is defined as the continuous twenty-four (24) hour period beginning at the employee's starting time.

Section 2 - All work performed by an employee in excess of eight (8) hours in any one work day or in excess of forty (40) hours in any one week shall be paid time and one-half the rate of the employee's regular hourly rate of pay or the rate of the job, whichever is higher, during such overtime hours.

Section 3 - Except as provided herein otherwise, all work performed on Saturday shall be compensated at time and one-half the rate of the employee's regular hourly rate of pay or the rate of the job, whichever is higher. Except as provided herein otherwise, all work performed on Sunday shall be compensated at double time the rate of the employee's regular hourly rate of pay or the rate of the job, whichever is higher.

In the event that the Company establishes an additional shift which includes Saturday and Sunday as regular work days, then all work performed by employees on such shift on their sixth day of work shall be paid at the rate of time and one-half the rate of the employee's regular hourly rate of pay or the rate of the job, whichever is higher. All work performed by employees on such shift on their seventh day of work shall be paid at the rate of double time the rate of the employee's regular hourly rate of pay or the rate of the job, whichever is higher.

For example, if the scheduled work week is Thursday through Monday, then all work on Tuesday shall be paid at time and one-half and all work on Wednesday shall be paid at double time.

Section 4 - There shall be no pyramiding of overtime or premium pay. Employees will be entitled to the single highest premium applicable to such work.

Section 5 - In the event an employee reports for work at his regularly scheduled starting time, not having been previously notified not to do so, he shall receive four (4) hours' work or four (4) hours' pay at the straight time regular rate in the event the Company does not assign him work. This provision shall not apply, however, if the failure to provide work is due to breakdown of equipment, emergencies, or other events beyond the control of the Company.

Section 6 - In the event of a machinery breakdown which causes an excess in the number of employees needed to operate on a particular shift, if it is anticipated that the repair of the equipment should be completed in three days or less, employees to be sent home without pay shall be first, general helpers (as designated on the Seniority List) and then those employees working on the affected equipment in order of seniority, subject to the ability of the more senior employees to perform the required work as designated on the Company's Skill and Ability Chart. If the duration of the shutdown extends beyond three days or if it is initially anticipated to last more than three days, then those employees working on the affected equipment will be laid off and will have bumping rights in accordance with the provisions of Article 27.

In the event of planned machinery maintenance or modification which causes an excess in the number of employees needed to operate on a particular shift, if it is anticipated that the maintenance or

modification of the equipment should be completed in three days or less, employees to be sent home without pay shall be first, general helpers (as designated on the Seniority List) then those employees working on the affected equipment in order of seniority, subject to the ability of the more senior employees to perform the required work as designated on the Company's Skill and Ability Chart.

If the duration of the shutdown extends beyond three days or if it is initially anticipated to last more than three days, then those employees working on the affected equipment will be laid off and will have bumping rights in accordance with the provisions of Article 27.

When the equipment repair, modification or maintenance is completed and the employees are recalled, employees will go back to their former positions and shifts and the recalled jobs will not be bid regardless of whether affected employees were sent home or were laid off with bumping rights.

Section 7 - Any employee who loses part of a day due to an injury received in the plant and is unable, because of such injury, to perform work for the balance of the shift on which the injury occurs, shall be paid at his regular rate of pay for the balance of the day.

When an employee, after returning to work, is required to return to the treating facility for medical follow-up, the visit shall be scheduled during non-working hours. When the medical facility cannot schedule such return visit during the employee's non-working hours, the Company will require the employee to clock out and in before and after such visit. The Company will compensate the employee at his regular rate of pay up to an accumulative total of eight (8) hours for all such return visits.

Section 8 - Schedules showing employee's regular work week and week day overtime shall be posted not later than 3:00 p.m. on Thursday of the calendar week preceding the week in which the schedule becomes effective.

Schedules showing Saturday and Sunday scheduled overtime shall be posted not later than 2:30 p.m. on the Tuesday preceding such Saturday or Sunday work.

Subject to seniority, with respect to any employee who is not listed for work on the work schedule which is posted on Thursday and who notifies the Company after 1:00 p.m. on Thursday of his release to return to work, the Company will make every effort to place the employee in an available job that he has the skill and ability to perform during the following work week.

Section 9 - In the event an employee is called back to work after leaving the plant at the end of his regular shift, he shall be guaranteed a minimum of four (4) hours' work or four (4) hours' pay at the appropriate overtime rate.

Section 10 - Any employee who works twelve (12) or more consecutive hours shall be paid $11.00 supper allowance, which will be paid weekly as an expense reimbursement in the employee's next regular paycheck. Effective February 1, 2017, the supper allowance shall be increased to $12.00.

Section 11 - The Company shall provide a thirty (30) minute paid lunch on each shift for employees who work more than four hours on such shift. Employees are not permitted to use the vending

6

machines at any other time during the day. There will be no eating permitted outside the lunchroom or designated areas.

Section 12 - When an employee is scheduled to work ten (10) hours or more on any given shift, such employee will be entitled to one (1) paid ten (10) minute break period during which break such particular employee shall be permitted to use the vending machines. If the additional work time is before the employee's regular starting time, the ten (10) minute break will be designated to be taken between the third (3rd) and fourth (4th) hour of work on that day. If the additional work time is after the end of the employee's regular quitting time, the ten (10) minute break will be designated to be taken between the eighth (8th) hour and the end of the employee's work day.

## ARTICLE 7 - OVERTIME

Section 1 - Recognizing the service nature of the business, overtime is required from time to time.

(a)     The Company will make every effort to equalize overtime opportunities for employees working in the same job class. When an employee for any reason fails to work scheduled overtime (weekend or week day) or fails to work an unscheduled overtime assignment which he has accepted, such employee will be charged double the amount of hours actually worked on such job or the scheduled hours for such job, whichever is greater; and, such employee will also be disciplined according to the Lateness and Absenteeism Rules.

(b)     When an employee refuses to accept an unscheduled overtime assignment, such employee will be charged the amount of hours worked by the employee who accepted the assignment or the hours offered for such job, whichever is greater.

Employees who agree to work overtime assignments or are required to work overtime and fail to do so shall in addition to appropriate discipline, be charged double the amount of hours actually worked or scheduled, whichever is greater.

(c)     Weekend overtime (scheduled or unscheduled) will be distributed to low hour employees in the following order:

(1)     To employees within the job class who holds title on their equipment. (If there is need to operate two shifts for such weekend overtime, the selection of shift for such weekend overtime will be made on the basis of seniority among the employee in the job class on their equipment. If there is need to operate three shifts for such weekend overtime, the overtime opportunity will be offered to the employees within the job class on each shift and employees will be assigned to the shift on which they regularly work.)

(2)     In event there are no employees in the job class, who holds title, operating the equipment during that particular week then such scheduled weekend overtime will be assigned to employees within the job class on other

7

equipment.

(3)     If there were no employees within the job class, who holds title, working on other equipment during that week, then such weekend overtime will be assigned to employees who have the skill and ability to competently and efficiently perform the work as determined by an "X" on the Company's Skill & Ability Chart.

(4)     In the event the Company is unable to obtain qualified employees to perform the required work, then notwithstanding anything to the contrary, the Company may have such work performed by persons not covered by the Collective Bargaining Agreement.

The determination of low hours will be made as of the Tuesday preceding such weekend work. The identity of persons working within the class or on the equipment during the particular week will be made as of the day the schedule is posted.

(5)     Schedules showing Saturday and Sunday scheduled overtime shall be posted not later than 2:30 pm on the Tuesday preceding such Saturday or Sunday work.

For scheduled weekend overtime, where an employee has been assigned to work weekend overtime and said employee has secured a replacement employee, acceptable to the Company, with an "X" in the Skill and Ability Chart who is willing to work the weekend overtime on behalf of the employee assigned to such overtime assignment, both the employee who was assigned the overtime and the replacement employee will be charged for the overtime hours worked. It will be the responsibility of the employee assigned to work the weekend overtime to notify the Company of such replacement not later than Wednesday at 5 pm immediately prior to such weekend overtime work. The Company will have no obligation or responsibility due to any error made by the employee originally assigned the weekend overtime in finding a replacement for such overtime work. The finalized weekend overtime schedule will be posted no later than 1 p.m. on Thursday. Weekend overtime that was posted by Thursday will not be canceled by the Company except for conditions beyond the Company's control.

(d)     When business conditions require scheduling a job for week day overtime, the employee scheduled on that job, for that week, will be scheduled for the overtime.

(e)     Absences or business conditions may produce unscheduled daily overtime opportunities. If the overtime opportunity is for eight (8) hours, and there is a three (3) shift operation, the first four (4) hours will be offered to the shift preceding the overtime, and the second four (4) hours, to the shift following the overtime. This overtime will be distributed to the employees who are working on the affected machine on each of the two

shifts involved.

If the eight (8) hour opportunity or any part of it is declined, then the overtime will be offered to employees on the appropriate shift within the job class on other equipment and third, to those employees on the said Company chart who have the skill and ability to competently and efficiently perform the work.

In the event the Company is unable to obtain qualified employees to perform the overtime work, then the employee working on the job that shift (not yet punched out), must work up to four (4) hours of overtime. Failure to work mandatory overtime will subject employee to the appropriate discipline under Rule 21.

(f)     When overtime occurs, a posting will be made of the job and personnel working the job. If the wrong person has been selected, it is the employee's obligation to notify his supervisor that the overtime was distributed incorrectly within 24 hours of such posting. Failure to do so precludes the filing of a grievance. If an employee, who should have been given the overtime assignment but was not assigned same due to error on the Company's part, brings the error to the Company's attention before the overtime was worked and the Company does not correct the error, then said employee shall be entitled to compensation for such overtime opportunity not assigned to him/her by Company.

(g)     All employees are required to be relieved before punching out at the end of their shift. When an employee is not relieved, he is required to report to his supervisor to determine if he is required to remain on the job. If required to remain on the job, this overtime will be paid for a minimum of two (2) hours for any time worked up to two (2) hours. Failure to do so will subject the employee to the appropriate discipline under Rule 21.

Where the supervisor has had at least one hour's notice of the lateness or absence of a replacement, the overtime assignment shall be made under the provisions of sub-section (e) of this article.

(h)     Weekend miscellaneous work not required to be performed by any particular job class, shall be first offered to employees with the least number of chargeable hours. When chargeable hours are equal, the overtime opportunity will be offered to the most senior employee. The rate of pay for this overtime will be the General Helper rate.

(i)     The appropriate discipline for reporting late or failing to work overtime will be an occurrence charge in compliance with the Absenteeism and Lateness Rules.

## ARTICLE 8 - GRIEVANCE AND ARBITRATION PROCEDURE

Section 1 - A grievance shall be defined as a dispute or complaint arising between the parties hereto as to the application or interpretation of this Agreement and shall be processed and disposed of in the following manner:

<u>Step One</u> - Once the occurrence becomes known or should have become known (whether by written notice, or verbal notice given in the presence of a Union representative), the aggrieved employee has three (3) working days to take the matter up with the foreman and the shift representative. The answer of the foreman shall be given within two (2) working days after the grievance has been given to the foreman.

<u>Step Two</u> - In the event the matter shall not have been satisfactorily settled in Step One, the grievance shall be reduced to writing by the grievant and a member of the Grievance Committee and presented to the foreman within five (5) working days from the time the answer is received by the Union in Step One. The grievant, a member of the Grievance Committee and a member of Management shall meet to consider the dispute. It is the obligation of both the Union and Management to schedule this Step 2 meeting within five (5) working days from the date of the submission of the written grievance.

   (a)    If the meeting required in Step 2 is not held within the time limit in such step, or such time limit is not extended by mutual agreement, the grieving party shall have the right to proceed to the next step. All mutual agreements for time limit extensions or resolving the grievance(s) at issue shall be reduced to writing.

Within five (5) days of such meeting, Management shall answer the grievance in writing. If this reply is not forthcoming, the Grievance Committee has the right to submit a letter to the Plant Manager or President of the Company demanding a written response to the Step 2 meeting.

<u>Step Three</u> - In the event no agreement is reached in Step 2; the grievance may be submitted by the Union or a member of the Grievance Committee for consideration by a representative or representatives of the International Union. Such submission must be made within ten (10) working days from the time the Union receives the Company's answer in Step 2. The grievance and a member of the Grievance Committee and a designated Executive or Executives of the Company, shall meet with the representative or representatives of the International Union to consider the dispute.

Within ten (10) days of such meeting, Management shall answer the grievance in writing. If this reply is not forthcoming, the Grievance Committee has the right to submit a letter to the Plant Manager or President of the Company demanding a written response to the Step 3 meeting.

<u>Step Four</u> - If a grievance is not satisfactorily adjusted under Steps 1, 2 or 3 of this Section, either party may submit the matter to arbitration within thirty (30) days after the Company's answer in Step 3. If the matter is submitted to arbitration, the arbitrator shall be selected by mutual agreement of the parties. In the event the parties are unable to agree upon the arbitrator, they shall jointly request the Federal Mediation and Conciliation Service (FMCS) to furnish the names of seven (7) arbitrators with each party having the right to reject the entire panel submitted (but only once on any one grievance). If one or two panels are rejected, the FMCS shall be asked to submit a final panel of seven (7) names. One of the seven (7) names on the final panel (or on an earlier panel that has not been rejected) shall be selected by the parties in the following manner:

Commencing with the party asking for arbitration, names shall be alternately stricken from the list until one remains.

Section 2 - The award of an arbitrator hereunder shall be final, conclusive and binding upon the Company, the Union, and the employee.

Section 3 - The Arbitrator shall have jurisdiction only over disputes arising out of grievances as defined in Section 1 of this Article. The Arbitrator shall absolutely have no power, either directly, indirectly, or consequentially to alter or amend the provisions of this Agreement, whether by ruling, interpretation or by the relief or remedy granted, or issue an award inconsistent with any applicable law.

      (a)    In cases of discharge, if the Arbitrator finds that there was cause therefore, the Company's action shall stand and shall not be reduced.

Section 4 - It is specifically understood and agreed that no grievance, dispute or misunderstanding of any kind shall be valid or cognizable (nor shall the Union or the employee present, or need the Company entertain or process it) where it is based on an occurrence, conduct, protest, complaint or conflict of opinion that precedes by more than the time limits prescribed in this Article for the presentation or submission of such initial grievance, dispute or misunderstanding.

The time limits provided in this Article may only be extended by mutual agreement confirmed in writing. However, no grievance, dispute or difference shall be entertained, processed, or arbitrated unless presented or submitted within the time limits prescribed in this Article, or within the time extension agreed upon, provided such time extensions are clearly set forth in writing.

      (a)    No extension granted hereunder shall constitute a precedent of any kind or for any other present purpose or any future purpose whatsoever.

Section 5 - In no event shall the Company's representatives attempt to settle any dispute or grievance directly with the employee or employees involved, if the first and subsequent steps stipulated above for the settlement of differences has not resulted in a settlement satisfactory to the parties.

Section 6 - Anything to the contrary herein notwithstanding, a grievance concerning a discharge or suspension must be presented initially at Step Three pursuant to the provisions of Article 8 and within the time limits provided in Step One of this Article.

Section 7 - Without waiving its statutory rights, a grievance on behalf of the Company may be presented initially at Step Three by notice in writing addressed to the Union at its offices.

Section 8 - A grievance which affects a substantial number or class of employees, and which the Company representative designated in Step One lacks the authority to settle, may initially be presented at Step Two or Step Three by the Union representative in the first instance within the time limit specified in Step One of this Article.

Section 9 - The fees and expenses of the Federal Mediation and Conciliation Service and the

arbitrator shall be borne equally by the parties.

Section 10 - Arbitration awards or grievance settlements shall in no case be made retroactive to a date prior to the date on which the grievance was first presented in Step One of the grievance procedure.

Section 11 - If the Company's representative does not, in any of the foregoing steps, respond within the time limitations provided therein, such failure to respond shall be considered a denial of the grievance and the Union, if it elects to do so, may proceed to the next step.

Where the Company does not respond at any step, the time limits (as provided in each step) within which the grievant and/or Union must proceed to the next step shall begin to run at the conclusion of the specified time allowed for the Company to answer.

## ARTICLE 9 - SUSPENSION & DISCHARGE CASES

Section 1 - No employee shall be peremptorily discharged. In all cases in which the Company may conclude that employee's conduct may justify suspension or discharge, he shall first be suspended for not more than five (5) plant working days. Written confirmation of the suspension shall be issued during the suspension period with a copy furnished to a member of the Grievance Committee as soon as possible.

The employee or the Union shall have the right within three (3) plant working days from the time of the discharge or suspension becomes known or should have become known (whether by written notice, or verbal notice given in the presence of a Union representative) to challenge the propriety of the penalty, but not thereafter. Any such penalty so challenged shall be considered a grievance to be disposed of in accordance with Section 6 of the Grievance & Arbitration Procedure.

Section 2 - Where an employee is suspended under the Company's Work Rules or Lateness and Attendance Rules, the discipline will become effective as of the date of the notice of such suspension. If the employee is not required to serve the disciplinary suspension within his next thirty (30) days of work following the date of such notice, it is specifically understood and agreed that while the actual notice of suspension will serve as progressive discipline under the particular rule involved, the employee will not thereafter be required to actually serve the time off.

It is further understood that the failure of an employee to serve the time off will not be considered a precedent of any kind in any matter or grievance involving that particular employee or any other bargaining unit employee nor will such fact be admissible in any grievance or arbitration proceeding involving the particular employee or any other bargaining unit employee, nor will any arbitrator be permitted to consider same in rendering a decision in a grievance involving the employee or any other bargaining unit employee.

Section 3 - Whenever an employee is required to attend a disciplinary meeting for suspension or discharge under the terms of this Article or under the Company's disciplinary rules, said employee shall have the right to request that a member of the grievance committee be present at any such disciplinary meeting. If a member of the grievance committee is not present in the plant then the employee may

request representation by the shift representative.

## ARTICLE 10 - UNION VISITATION

Section 1 - An authorized representative of the International Union shall be permitted to visit the offices or plant of the Company during working hours to investigate any matter covered by this Agreement, but he shall in no way interfere with the progress of the work. Before visiting the plant, the Union representative will first notify the Company. There shall be no Union activity on Company time.

## ARTICLE 11 - VACATIONS

Section 1 - Eligibility - Employees hired after the date of ratification and who has attained the years of continuous service indicated in the following table, shall, following the employee's anniversary date of employment, receive vacation corresponding to such years of service.:

| Service Years | Vacation |
|---|---|
| One (1) year but less than two (2) years | 1 Week |
| Two (2) years but less than six (6) years | 2 Weeks |
| Six (6) years but less than fifteen (15) years | 3 Weeks |
| Fifteen (15) years or more of service | 4 Weeks |

Employees hired prior to January 31, 2015, and who has attained the years of continuous service indicated in the following table, shall, following the employee's anniversary date of employment, receive vacation corresponding to such years of service.

| Service Years | Vacation |
|---|---|
| One (1) year but less than two (2) years | 1 Week |
| Two (2) years but less than six (6) years | 2 Weeks |
| Six (6) years but less than fifteen (15) years | 3 Weeks |
| Fifteen (15) years but less than 25 years | 4 Weeks |
| Twenty-five (25) or more years of service | 5 Weeks |

Section 2 - Vacation pay shall be based on forty (40) hours at the employee's regular straight-time hourly rate including shift differential for each week of earned vacation including a vacation "work-through".

Section 3 - Employees with one week of vacation must take their earned vacation time off. Any employee with two weeks or more of vacation must take at least one week of vacation time off. If the employee wishes to "work-through" his third and/or fourth week(s) of vacation, he may only do so with Company approval.

Section 4 - Shutdown - The Company reserves the right to shut down all or part of its plant for vacation purposes. Employees eligible for vacation will be scheduled on vacation for the period of the shutdown. No employee will be required to take more than two weeks of his/her vacation during plant shutdown periods. The Company will give notice of its intention to shut down all or part of its plant for vacation purposes not later than the end of the first full week in January of the then current year.

Section 5 - Scheduling of Vacations - The Company will establish the number of employees who shall receive their vacation at any given time so as to cause the minimum interference with the operation. Each employee will be notified not later than the end of the first full week in January of his vacation eligibility and each employee will advise the Company not later than the end of the first full week in February of his preference. The Company will post the first draft of the vacation schedule during the third full week in February, with preference where possible, being given on the basis of Company seniority.

When an employee must make a revised vacation schedule choice, he must respond within forty-eight (48) hours of being notified, or he loses all his seniority preference in establishing the vacation schedule. The Company will establish who shall receive their vacation at any given time and will post the vacation schedule not later than March 15.

Section 6 - An employee has 12 months from his/her anniversary of employment to schedule and take his/her vacation in accordance with the provisions of this Article. Vacations may not be accumulated to employee's next anniversary year.

Section 7 - Miscellaneous - Except for vacations taken in a holiday week, vacations will be full weeks (Monday through Sunday) and not in days. If a vacation is taken during a week in which a paid holiday(s) falls, at the employee's option, the employee can receive pay for the unused vacation day(s) or reschedule these vacation days in accordance with the provisions set forth below in this section. Vacation pay will be distributed on the Thursday preceding the start of vacation.

> (a)     Individual days of holiday week unused vacation must be taken within 12 months of the employee's anniversary date of employment;
>
> (b)     Such holiday week unused days of vacation may not be taken during the period of April 15th to September 15th;
>
> (c)     A request to take a single day of vacation (where an employee is entitled to a single day because said employee had scheduled a vacation during a holiday week) will be subordinate to any employee's request for full week(s) of vacation when such request has been made prior to January 31st of the calendar year during which the vacation(s) is to be taken;

(d)     An employee who wishes to take such day(s) of holiday week unused vacation must request same, in writing, not less than five working days in advance;

(e)     The granting of such day(s) of holiday week unused vacation will be subject to the scheduling limitations provided in Section 5 of this Article."

Section 8 - Any fully earned but untaken vacation pay will be paid to employees who retire, resign their employment or are discharged.

## ARTICLE 12 - SENIORITY

Section 1 - Company seniority shall be defined for the purpose of this Agreement as the employee's continuous employment with the Company beginning with the latest date of the employee's hire. In the event two or more employees are hired with the same starting date, the most senior employee shall be the one with the lowest last four digits of the Social Security number.

Section 2 - Except as provided otherwise in this Agreement, seniority shall be considered, but skill and ability and physical fitness to competently and efficiently perform the required work shall be the governing factor in:

(a)     Reduction of the workforce and layoffs.

(b)     Recall of laid-off employees.

(c)     Posting of job bids.

Section 3 - The continuous service of any employee shall be broken and employment shall be terminated by:

(a)     Voluntary quitting.

(b)     Failure to report at the expiration of a leave of absence.

(c)     Illness or absence from work for any reason including layoff for a period of time equal to length of service with the Company but not to exceed eighteen (18) months.

(d)     After illness or injury, failure to return to work within two (2) working days from date of medical certification of his ability to return to work.

(e)     Absence from work for three (3) consecutive work days without notification to the Company unless the employee can establish he was unable to do so.

(f)     Failure to report for work within seven (7) calendar days after written registered notice (date of mailing) of recall from layoff (except layoff resulting from machine

15

breakdown, repair, planned maintenance or modifications, in which event, the employee must report within three (3) days after such registered notice) to the last address appearing on the Company's records. Duplicate copies of such notice shall be sent to the Union at the same time they are sent to the employee.

(g)    Retirement.

(h)    Discharge for just cause.

Section 4 - Seniority lists of all employees shall be supplied by the Company to the Union. All complaints with respect to such lists shall be made in writing to the Company within ten (10) days from the date the list is delivered, and to the extent the list covers employees with respect to whom no complaints have been made within this ten (10) day period, the list shall stand. Any complaints made on such lists shall be determined in the manner set forth for the settlement of grievances in accordance with Article 8.

## ARTICLE 13 - PROBATIONARY EMPLOYEES

New employees and those hired after a break in continuity of service will be regarded as probationary employees until they have accumulated ninety (90) calendar days and will receive no continuous credit during such period. During this period of probationary employment, probationary employees may be disciplined, suspended, or discharged as exclusively determined by the Company. Discipline, suspension or discharge shall not be subject to the grievance and arbitration provisions of this Agreement. Probationary employees continued in the service of the Company subsequent to such ninety (90) calendar days shall receive full continuous service credit from the date of original hiring.

## ARTICLE 14 - HOLIDAYS

Section 1 - Paid Holidays per calendar year are:

| | |
|---|---|
| 1. New Year's Day | 7. Friday after Thanksgiving |
| 2. Good Friday | 8. Christmas Eve |
| 3. Memorial Day | 9. Christmas Day |
| 4. July 4th | 10. New Year's Eve |
| 5. Labor Day | 11. Two (2) Personal Holidays: |
| 6. Thanksgiving Day | (With five work days' written notice, which will be responded to by management on a timely basis. One personal holiday per calendar year may be used as a sick day without prior advance scheduling.) |

Section 2 - A full day of holiday pay is based on eight (8) hours' pay at the regular straight time rate, including shift differential. Employees must work the full day on the employee's last scheduled work day prior to the holiday and the full day on the employee's first scheduled work day after the holiday, except in the case of proven illness, or an absence mutually agreed upon in writing between the employee and the Plant Manager, also, in the case of machine breakdown, when the employee is sent

home in less than an eight (8) hour shift. An employee who is absent from work because of layoff shall, when recalled to work, be paid for any of the holidays designated in Section 1 of this Article that falls within the first seven (7) calendar days following the first day of layoff.

> (a) The Company will not disqualify an employee for holiday pay for a lateness of up to one hour on the Company's last scheduled work day prior to the holiday, or the Company's first scheduled work day after the holiday.

Section 3 - When an employee is temporarily transferred out of his regular job during the week in which a holiday occurs, the transferred employee will be paid at his regular straight time hourly rate or if the transfer is to a higher rated job and is for two or more days he will be paid at the higher rate for the holiday.

Section 4 - New employees will be eligible for all holidays, the two (2) personal holidays excepted, upon completion of the probationary period.

A new employee hired between January 1st and April 30th of any contract year shall be eligible to receive two (2) personal holidays during such contract year.

A new employee hired between May 1st and August 31st of any contract year shall be eligible to receive one (1) personal holiday during such contract year.

A new employee hired between September 1st and December 31st of any contract year shall not be eligible to receive any personal holidays during such contract year.

Notwithstanding the provisions above regarding personal holidays for new employees, a new employee shall not earn nor shall he be permitted to schedule and take a personal holiday until such new employee has completed one (1) month of service with the Company following the completion of such new employee's probationary period.

Section 5 - Employees who work scheduled hours on a holiday shall receive holiday pay at the regular straight time rate, including shift differential plus double the straight time rate including shift differential for all such hours worked on a holiday. Employees who fail to work scheduled hours on a holiday shall not receive the holiday pay.

Section 6 - An employee who would otherwise be eligible for holiday pay but is absent and is receiving Sickness and Accident Insurance benefits, shall be paid the difference between his insurance payment and his regular pay for the day. This payment will apply to all Company paid holidays occurring within six months from the beginning of the disability providing the employee actually returns to work within six months from the commencement of the disability. In the event the employee fails to return within six months, no holiday pay is earned under the above.

The personal holiday requiring five days' notice, vacations, and vacations including a holiday, are not included in this policy.

17

These payments will be made in the first paycheck upon the employee's return to work after the disability. The pay computation will be based on the difference between gross regular straight time hourly wages including shift premium (when applicable) for the day and the gross insurance payment.

Except as noted below, no holiday pay or compensation for personal holiday days will be made for those receiving benefits under Worker's Compensation. Qualified employees who have actually worked a minimum of two full days during the calendar year will be paid for unused personal holidays at the end of the calendar year even if receiving Worker's Compensation benefits at the end of such year.

Section 7 - The two (2) personal holidays shall be scheduled in advance upon five (5) days' written notice to the Company. Requests for the personal holiday prior to May 15th will be granted on the basis of Company seniority and after May 15th on a first come - first serve basis. In both instances, the final determination of the number of employees in any given job class or work center who shall receive their personal day on any given day, shall be made by the Company.

Notwithstanding the requirements herein above set forth in this Section, an employee who wishes to schedule and take one of his personal holidays on Martin Luther King's Birthday may do so without limitation on the number of employees who do so, provided the employee notifies the Company, in writing, not less than three (3) weeks in advance of such day.

Section 8 - Unused personal holidays and/or sick days from the prior calendar year will be paid to employees not later than by the second pay date after January 1st of the succeeding calendar year.

Employees who retire or resign their employment (with advance written notice to the Company) or who are discharged by the Company will be paid for such unused personal holidays and/or sick days within 20 days of employees' last day of work, except that those employees who are discharged for willful misconduct will not be entitled to any unused personal holidays and/or sick days.

## ARTICLE 15 - SAFETY COMMITTEE, SAFETY & HEALTH

Representatives of the Company will meet with the Safety Committee (consisting of not more than four (4) employees) of the Union at mutually convenient times but not less than quarterly during any calendar year for the purpose of improving general safety conditions. Either the Company or the Union may request more frequent meetings as the need requires and such meetings will be held promptly after such request is made.

The Company and the Union recognized the importance of safety provisions in the plant for the protection of the safety of employees. All customary and necessary protective devices, goggles, gloves, fire and waterproof clothes and other articles necessary to properly safeguard the safety of employees and protect employees from injury shall be provided by the Company without cost to the employees.

If OSHA standards or guidelines require periodic physical examinations, eye examinations or job certification, the parties will comply on a timely basis.

## ARTICLE 16 - SAFETY SHOES & SAFETY EQUIPMENT

The Company agrees that it will pay to each bargaining unit employee on the anniversary of his/her employment $155.00 as reimbursement for the cost of purchasing required safety shoes.

Employees will be required, as a condition of employment, to be wearing, during all work hours, safety shoes that provide the required protection. Any employee not wearing such safety shoes will be sent home and will be charged with an unexcused absence. Upon the second of such incident in a twelve month period the employee will be suspended for two days without pay. The third time in a twelve month period such employee fails to wear such safety shoes he/she will be discharged. Where such employee has been sent home, or suspended under this policy, the Company will have the right to have the employee's supervisor, or any other person that it designates, perform the employee's work during such employee's absence.

It is specifically understood and agreed that employees must wear and/or use all such safety equipment.

## ARTICLE 17 - LEAVES OF ABSENCE

Section 1 - Employees covered by this Agreement shall have the right to make application for leaves of absence for justifiable reasons. The Company will give consideration to the circumstances of each application and shall have the right to determine whether or not the leave shall be granted and the duration of any leave of absence. Application for leaves shall be in writing. Such leaves will be without pay; and the employees on such leave will not earn or receive holiday pay, vacation pay, funeral pay or jury duty pay. Insurance coverages continue for thirty (30) days from the date a leave of absence is granted.

The representative of the Union shall have the right to confer with the Company concerning the application for the leave of absence, but at all times the Company's decision shall be final and not subject to the grievance procedure.

Section 2 - Military Duty - An employee who shall be drafted or enter the Armed Forces of the country shall, at the end of such service, if physically and mentally fit, be reinstated to his position with full seniority, provided however:

      (a)     He shall make application for reinstatement within ninety (90) days from his honorable discharge from the Armed Forces or within such further period as may be hereinafter prescribed by law;

      (b)     The Company's circumstances have not so changed as to make it impossible to provide employment.

Section 3 - On written application, a leave of absence, without pay, for a period not exceeding a cumulative total of thirty (30) calendar days in any one calendar year, will be granted to employees who have been selected by the Union, for the purpose of representing the Union in convention or for other

Union business outside the plant, not to exceed one such member at any one time. In event such leave of absence is granted, the employee shall advise the Company at least seven (7) days prior to the start of such leave.

An employee having two (2) or more years of continuous service with the Company who is elected or appointed to perform service as a representative of the International Union, or AFL-CIO, shall be granted a leave of absence without pay for a period not to exceed one (1) year. Any employee granted such leave in accordance with this section shall accumulate seniority during such leave of absence. Extensions may be granted beyond the one year period, but not to exceed one employee. In no event shall the Company be obligated to grant more than one such leave to any of its bargaining unit employees.

Section 4 - Any employee who has been granted a leave of absence from the Company and who accepts paid employment from another Company, other than as provided in Section 3 of this Article, shall be treated has having thereby resigned his/her employment with the Company.

## ARTICLE 18 - INSURANCE

Section 1 - New employees will become eligible for the following life and disability insurance coverages on the first day of the calendar month following completion of their probationary period. Such insurance coverages shall be in accordance with the terms and conditions of the particular insurance carrier's policy:

> (a)     Life Insurance and Accidental Death Benefits shall be $50,000.

> (b)     Accident & Sickness Benefits - Twenty-six (26) weeks. Two-thirds (2/3rds) gross earnings up to $480.00 maximum per week, effective as soon as possible after February 1, 2015.

> Effective February 1, 2016, the maximum weekly benefit will be increased to $490.00 per week.

> The benefit will become effective the first day for an accident, and the eighth day for a sickness.

Section 2 - Following a new employee's completion of his/her probationary period and subject to the provisions dealing with employee contributions hereinafter set forth in this Article such employee shall be eligible to participate in the Company's Medical Insurance Plan in accordance with the terms and conditions of the insurance carrier's policy).

The Company's health insurance plan is the following Aetna Health Care Plan:

> Aetna Health Care Plan**
> Primary Care Physician co-pay $25 per visit
> Specialist co-pay will be $50 per visit
> Prescription Plan co-pay will be $15 / $35 / $50 - (mail order - two times retail

20

co-pay)
Hospital Inpatient co-pay $1,000*
Outpatient Surgery co-pay $500*
Emergency Room co-pay $100

*The Company will reimburse employees for Hospital Inpatient and
Short Procedure Unit co-pays.

** A benefits summary sheet is attached to this Agreement, and complete plan
materials will be distributed at the time of the plan change.

Section 3 - All employees (whether actively at work or on layoff, disability, etc.) participating in
the Company's medical insurance plan will be required to make the appropriate weekly contribution set
forth in subsection (a), (b) & (c) below towards such coverage.

(a)     Through March 31, 2015, employees desiring single coverage will be required to
contribute the weekly sum of $41.04ˈ for such coverage.

(1)     Effective April 1, 2015, the single coverage weekly employee
contribution will be $42.53. As of April 1st of each subsequent contract year, the
employees' contribution for such coverage will be increased by an amount equal
to 30% of the increase in premium over the prior year's premium. This amount
will be added to the amount that the employee is contributing for such coverage
as of March 31st of each year of this Agreement.

(b)     Through March 31, 2015, employees desiring parent and child, parent and
children or husband/wife coverage will be required to contribute the weekly sum of
$131.64 for such coverage.

(1)     Effective April 1, 2015, the parent and child, parent and children or
husband/wife weekly employee contribution will be $127.61. As of April 1st of
each subsequent contract year, the employees' contribution for such coverage
will be increased by an amount equal to 30% of the increase in premium over the
prior year's premium. This amount will be added to the amount that the
employee is contributing for such coverage as of March 31st of each year of this
Agreement.

(c)     Through March 31, 2015, employees desiring family coverage will be required to
contribute the weekly sum of $136.96 for such coverage.

(1)     Effective April 1, 2015, the family weekly employee contribution will be
$132.93. As of April 1st of each subsequent contract year, the employees'

ˈ See Side Letter of Understanding dealing with employee medical insurance contribution, dated March 19,
2007, attached hereto.

contribution for such coverage will be increased by an amount equal to 30% of the increase in premium over the prior year's premium. This amount will be added to the amount that the employee is contributing for such coverage as of March 31st of each year of this Agreement.

(d) The Company and Union representatives shall meet annually to discuss the cost of upcoming medical insurance premium increases with the goal of minimizing or reducing both Company and employees premiums.

Section 4 – The Company will continue in effect its Vision Care Program, which reimburses employees for eye examinations, new eyeglass lenses and frames, repairs and replacements, and contact lenses up to $190.00 per employee with a maximum of $465.00 per family per calendar year. Only one new pair of eyeglass lenses and frames per person every two (2) calendar years are allowed. Only paid bills that are itemized showing the service or item supplied and the price paid are accepted for reimbursement under the Program.

Section 5 - The Company will continue to provide a contributory Dental Program. Employees who are eligible to participate in the Company's medical insurance plan will be permitted to participate in the Dental Program in effect as of the effective date of this Agreement. Employees will be required to contribute 40% of the premiums for such Dental Insurance, whether for individual or family coverage.

Section 6 - In accordance with the other provisions of this Agreement, the foregoing coverages are only for regular full-time non-probationary employees who are actively at work. Employees who are not actively at work will receive coverage under the following circumstances only:

(a) Where an employee is laid-off for lack of work, the Company will pay its share of the monthly premiums for one (1) calendar month following the month in which the layoff occurs.

(b) Where an employee is disabled as a result of a non-occupational illness or accident and is actually receiving sickness and accident disability benefits under the Company's weekly indemnity program (or such disability continues beyond the twenty-six week benefit period, in which event medical proof of such continuing disability will be required) or where an employee is disabled as a result of an occupational accident and is actually receiving worker's compensation, the Company will pay its share of the monthly premiums for the period of such disability, but not to exceed the lesser of twelve (12) calendar months following the month in which such disability commenced or for the period of time which the particular employee retains recall rights under Article 12, Section 3(c).

*Note: Where an employee, as of January 31, 2015, is disabled as a result of a non-occupational illness or accident and is actually receiving sickness and accident disability benefits under the Company's weekly indemnity program (or such disability continues beyond the twenty-six week benefit period, in which event medical proof of such continuing disability will be required) or where an employee is disabled as a result of an

32

occupational accident and is actually receiving worker's compensation, the Company will pay its share of the monthly premiums for the period of such disability, but not to exceed the lesser of eighteen (18) calendar months following the month in which such disability commenced or for the period of time which the particular employee retains recall rights under Article 12, Section 3(c).

Section 7 - The Company shall have no obligation to make any payment on account of coverage under Sections 3 and 5 of this Article for any employee (neither the Company's share nor the employee's share) unless, at the time such premium is due, there is sufficient of the employee's money on hand with the Company, whether by way of wages due to such employee or monies deposited by the said employee with the Company, for the purpose of paying such employee's share of the applicable insurance premiums. If an employee's coverage is terminated because of such non-payment, the risk is on such employee. Therefore, the employee has the burden of seeing that the Company has sufficient of his funds on hand to pay his said shares of the applicable insurance premiums.

## ARTICLE 19 - NO STRIKE - NO LOCKOUT

Section 1 - During the term of this Agreement and any renewal thereof, there shall be no lockout by the Company or any authorized agent of the Company, nor shall the Union or any of its members authorize, call, support, sanction, approve, participate or take part in any strike, slowdown, absence because of pretended illness or other concerted cessation of work; and, further, the Union and its members agree not to sponsor, authorize, call support, sanction, approve or take part in any sympathy strike, secondary boycott, political strike, picketing, or refusal to cross any picket line of any kind which is directed at the Company, nor will the Union or its members oppose or interfere with discipline imposed upon any employee who has, under the process of this Agreement, been determined to have committed or participated in any of the conduct prohibited by this Article.

> (a)     In the event that any employees covered by this contract violate the provisions of this section, the officers and shift representatives of the Union shall, by persuasion and every other lawful means, endeavor to dissuade such employee or employees from continued violation of the provisions of this Section, and the Union shall take appropriate internal action against those employees violating the provisions of this Section.

Section 2 - Violations of the provisions of this Article shall not be arbitrable, and the Company shall not be prohibited from seeking and obtaining judicial injunctive and compensatory relief. However, any employee who is discharged or disciplined for a violation of this Article shall have a right to grieve his discharge or discipline under the provisions of this Agreement.

## ARTICLE 20 - PERFORMANCE OF WORK BY NON-BARGAINING UNIT EMPLOYEES

Section 1 - Supervisors or other non-bargaining unit employees shall not perform work normally performed by employees covered by this Agreement at any time, except where otherwise provided in this Agreement and as listed below:

> (a)     In the event that Bargaining Unit employees are temporarily (a period not to

exceed ½ hour) not available to perform the specified task (in which event persons who are not members of the bargaining unit may temporarily perform such work until such Bargaining Unit employee returns), or in cases of development and experimental work, or to determine production processes and costs in testing material and equipment, or for the purpose of instruction, or in cases of emergency.

(b)     To work with a maintenance man in the performance of maintenance work.

(c)     In the absence of a maintenance man to perform maintenance work for a period of time not to exceed one (1) hour.

## ARTICLE 21 - BEREAVEMENT PAY

Section 1 - Employees who have completed their probationary period who suffer a death in the immediate family, defined as: parent, wife, child, husband, brother, sister and present mother-in-law and father-in-law, shall be allowed up to three (3) days paid funeral leave, within seven calendar days from the date of death, one of which shall be the day of the funeral between the date of death and the date of the funeral with straight time pay, not to exceed eight (8) hours pay for time lost each day for the express purpose of arranging for and/or attending services for the deceased.

Section 2 - In the event of the death of a non-probationary employee's grandparent, grandchild, the employee shall be allowed up to two (2) days paid funeral leave, within seven calendar days from the date of death, one of which shall be the day of the funeral between the date of death and the date of the funeral with straight time pay, not to exceed eight (8) hours pay for time lost each day for the express purpose of arranging for and/or attending services for the deceased.

Section 3 - Employees will be reimbursed only for actual time lost from work for which he/she was scheduled but not to exceed eight (8) hours per day. Verification shall be supplied to the Company.

## ARTICLE 22 - JURY DUTY

Section 1 - Any regular full-time employee who has completed his probationary period and is called for jury service shall be excused from work for the days on which he serves and he shall receive, for each such day of jury service on which he otherwise would have worked, the difference between eight (8) times his straight time hourly base rate of pay and the payment he receives for jury service. The employee will present proof of service and the amount of pay received therefore to the limit of ten (10) working days in any calendar year.

Section 2 - All employees, as defined above, called for investigating Grand Juries will be reimbursed 50% of the difference between eight (8) times his straight time hourly base rate of pay and the amount of payment received for such jury service up to fifty (50) working days for one calendar year.

The employee will present proof of service and the amount of pay received.

## ARTICLE 23 - MONTHLY MEETINGS

The Company will continue its practice of meeting with the designated Union representatives (consisting of not more than 3) at mutually convenient times but not less than quarterly during any calendar year for the purpose of improving productivity and discussion of general business conditions. Either the Company or the Union may request more frequent meetings as the need requires and such meetings will be held promptly after such request is made.

## ARTICLE 24 - UNION SHIFT REPRESENTATIVE & GRIEVANCE COMMITTEE

Section 1 - The Union shall have the right to designate one (1) shift representative on each shift.

Section 2 - The Union must designate an alternate shift representative on each shift. The alternate shall act only in the event of the absence of the shift representative. Limited to their particular shift, the shift representatives (and not the alternates) shall have top seniority for purposes of layoff and recall only, provided that such a shift representative has the physical fitness and the skill and ability to competently and efficiently perform the required work. In such event, such shift representative shall be the last person on his or her particular shift to be laid off.

Section 3 - The Union shall also have the right to designate a Grievance Committee to consist of three members. The members of the Grievance Committee shall have top seniority for purposes of layoff and recall provided that such particular Grievance Committee person has the skill and ability to competently and efficiently perform the required work.

Section 4 - When a shift representative or grievance committee member is laid off, such individual may elect to bump using either his natural seniority or his top seniority under this Article.

Section 5 - When exercising his top seniority under this Article, either on a particular shift (in the case of shift representatives) or plant-wide (in the case of Grievance Committee members), such bumping employee must bump to the job of the most junior man on his shift (in the case of shift representative) and the job of the most junior man-in the plant (in the case of Grievance Committee members) provided he has the physical fitness and skill and ability to competently and efficiently perform the required work.

Section 6 - When exercising his natural seniority, such bumping employee must follow the procedures outlined in Article 27 of this Agreement.

Section 7 - If a shift representative bumps off of his regular shift he will no longer be considered a shift representative. In such event, the Union shall have the right to designate a substitute shift representative, if such shift continues in operation.

## ARTICLE 25 - BULLETIN BOARDS

A bulletin board in the Plant shall be available for posting of Union notices only.

## ARTICLE 26 - TEMPORARY VACANCIES AND JOB BIDDING

25

## Section 1

(a)     Except for vacancies arising due to vacations or personal holidays, when a temporary vacancy occurs in any job covered by this Agreement, Maintenance excepted, the Company may fill the vacancy temporarily for a period not to exceed thirty (30) days. If the temporary vacancy continues beyond twenty-five (25) days, the Company will post such temporary vacancy as a temporary opening, to be filled temporarily in accordance with the procedures herein set forth for filling new jobs or permanent vacancies. A temporary vacancy shall be deemed to occur when an employee who normally performs such work is absent because of any reason other than for vacation or personal holidays.

(b)     Whenever a temporary vacancy arises due to vacation, the vacancy will be filled in accordance with the following procedure:

1.     Such vacancy will first be offered in order of seniority to the employee who holds title to the job on another shift,

2.     if no employee who holds title to the job in which a vacation vacancy occurs wishes to transfer to the shift on which the vacancy occurs, then the Company may fill the position by assigning an employee to such vacancy who holds an "X" in that job on the Skill and Ability Chart

3.     any resultant vacancies which occur as a result of the application of this provision will be filled at the Company's option by offering the resultant vacancy to the senior employee who hold title on that job on another shift or by covering the vacancy by having the employee who works in that position on the prior shift work an additional 4 hours of overtime after the conclusion of his shift and the employee who works the succeeding shift report 4 hours earlier than his regular starting time.

(c)     Should the Company decide to fill any vacancy arising due to an employee taking a personal holiday, such vacancy will be filled in accordance with the provision of Article 7, Section 1(c) of this Agreement.

Section 2 - An employee who is not in progression who bids to a temporary vacancy shall, for purposes of compensation, sick pay, holiday pay and vacation pay be considered as a permanent employee in such temporary position for the duration of the time the employee remains in the temporary vacancy. Pay for sick days, holidays, personal holidays, and for a vacation taken while in the temporary position will be at the temporary regular straight time hourly rate.

Employees who are in progression and bid to a temporary vacancy will be paid in accordance with Article 26, Section 10.

Section 3 - In the event of a new job or permanent vacancy above General Helper, at the time of filling the job temporarily, the Company shall post a notice in appropriate places throughout the plant for

26

three (3) consecutive work days. Any employee in any classification, subject to the provisions, in Sections 4 and 5 below, desiring the vacant position or new job, shall apply in writing on forms furnished by the Company within the three (3) consecutive work days.

Such vacancy will be filled by the Company on a permanent basis from its current work force in accordance with the provisions of this Article.

Newly hired employees shall not be permitted to bid on any job vacancies until such employees have successfully completed their probationary periods.

Section 4 - Bidders to the following positions must possess general physical fitness for the job, the ability to read, and in addition, the following qualifications:

| Carpenter | Ability to read a tape to 1/16". Compute with fractions. |
| Bander | Ability to read a tape to 1/32". Compute with fractions, and the use of a coil calculator. |
| Loader | Ability to drive safely, read a tape to 1/32". Compute with fractions and decimals. |
| 60" Slitter "B" Helper | Ability to read a tape to 1/32". Compute with fractions and decimals. |

The bidder for Carpenter, Bander, Loader, Material Handler, and 60" slitter helper must also possess a satisfactory attendance and lateness record consisting of no written warnings for attendance or lateness within the prior six (6) calendar months from the date of his job bid.

In connection with bids for jobs listed in this section, the most senior bidding employee who possesses all of the stated qualifications shall be awarded the first opportunity to qualify for the particular job.

Section 5 - Qualified awardees for jobs listed in Section 4 of this Article shall be given up to twenty (20) working days to qualify for the job. If the employee awarded the job demonstrates that he does not have the ability to competently and efficiently perform the job in less than the twenty (20) working day qualifying period, such employee shall not be entitled to the full twenty (20) working day trial period. If, on the other hand, the employee demonstrates, in less than twenty (20) working days, that he has the ability to competently and efficiently perform the job, such employee shall receive the rate of the job at such time as such ability is demonstrated.

Section 6 - Bidders for new jobs or permanent vacancies for "Skilled Jobs" (classifications other than General Helper and the classifications listed in Section 4 of this Article) must possess the skill and ability to competently and efficiently perform the required work (as designated on the Company's Skill and Ability Chart), the physical fitness necessary to perform the required work and a satisfactory attendance and lateness record consisting of no written warnings or suspensions for attendance or lateness

$\mathcal{A}$7

he shall receive an additional twenty-five percent (25%) of the difference between his regular rate of pay and the "B" rate of pay of the job for which he is training.

(d)      After completion of sixty (60) working days on such job for which he is training, he shall receive the "B" rate of pay of the job for which he is training.

Section 9 - In an attempt to establish a reasonable level of continuity in the job of material handler, the Company and the Union have agreed to upgrade the material handler classification to a "Skilled Job" and to increase the permanent classification rate of pay for the material handler, which job shall be subject to the following limitations:

(a)      The material handler will not be permitted to bid on any temporary vacancy except to a vacancy in the material handler classification on another shift, nor will the Company be required to consider the material handler, regardless of seniority, for any temporary transfer. The classification rate of pay of material handler is being increased to compensate the material handler for such lost opportunities.

(b)      The material handler will be permitted to bid out of the material handler classification to another permanent job, subject to the provisions of this Agreement regarding job bidding.

(c)      In event of a layoff and subsequent recall, the individual who held the material handler's job at the time of such layoff shall have the right to go back to such job if he desires to do so and the job shall not be subject to bid.

Section 10 - Where an employee who is in progression either bids according to the provisions in this Article and receives a non-"Skilled Job" other than General Helper, or is permanently assigned a non-"Skilled Job" other than General Helper, he shall receive the difference in rate between the General Helper's rate and such job in addition to his rate in progression. When an employee who is in progression (and does not hold a permanent classification other than General Helper) is temporarily assigned to work in the classifications of Bander, and Carpenter, such employee will receive only his progression rate. When an employee who is in progression and is temporarily assigned to work in a non-"Skilled Job", he shall receive the difference in rate between the Bander's rate and such job in addition to his rate in progression.

(a)      Where an employee who is in progression previously held a classified job but no longer does (because of being bumped out of such job), if such employee is temporarily assigned to work back in such classification, such employee will be paid the difference between the general helper rate and the rate of the job in addition to his rate in progression.

Section 11 - From time to time, the Company will choose to train people in jobs which are already filled. These training opportunities will be posted. Bidders to train for classifications listed in Section 4 must possess the qualifications as stated in Section 4. Bidders to the following training opportunities must possess either an "X" on the Company's Skill & Ability Chart or have

29

prior similar experience in any of the qualifying jobs:

| Training Opportunity | Qualifying Job |
|---|---|
| Headsetter | 24" Slitter Operator, Stamco Assistant Operator. |
| Stamco Operator | Stamco Assistant Operator. |
| 60" Blanking Line Operator | 36" Blanking Line Operator, 24" Slitter Operator. |
| 72" Blanking Line Operator | 60" Blanking Line Operator or 72" Assistant Blanking Line Operator[1] |

24" Slitter and 36" Blanking Line Operator must have the ability to read a tape to 1/32", compute with fractions and decimals, ability to use a coil calculator, the ability to read a micrometer and a vernier.

Material handler must have the ability to read a tape to 1/32", compute with fractions and decimals, ability to use a coil calculator, and the ability to read a micrometer.

All Assistant Operators must have the ability to read a tape to 1/32". Compute with fractions and decimals. The ability to read a micrometer, vernier and to use a coil calculator.

All 60" Assistant Slitting Line Operators will, immediately upon being awarded the position, be placed in progression for the classification of 60" Slitting Line B Operator.

Once an employee completes the training, such employee will receive an "X" for such job on the Company's Skill & Ability Chart.

Section 12 - In the event that none of its current employees have the necessary qualifications to competently and efficiently perform the bid job and after all bidders have failed to satiafactorily complete the trial period, the Company shall have the right to fill the job or training opportunity with the most junior qualified employee in the Bargaining Unit, or a new employee.

Section 13 - Employees in a given job classification cannot bid on a job within that classification except for change of shift.

Section 14 - Employees will be entitled to submit only one lateral bid (a bid to a classification with the same rate of pay) for a permanent opening in a six (6) month period or downward bid for a permanent opening only once in an twelve (12) month period. The six (6) month period for such lateral bids or twelve (12) month period for such downward bids will begin the day the bidding employee is permanently awarded the job. Such bidding employee may not, during the six (6) month period for lateral

---

[1] All 72" Assistant Blanking Line Operators are, immediately upon award of position, placed into progression for the classification of 72" Blanking Line "B" Operator.

bids or the twelve (12) month period for downward bids, submit another lateral or downward bid or a bid to the same job classification and shift from which he made his lateral or downward bid.

A lateral or downward bid for health reasons, as may be verified by the Company doctor, will not be subject to the above monthly restrictions.

All employees bidding into a lower paying classification shall be paid the lower rate of pay as soon as they are moved into such lower rated job.

## ARTICLE 27 - REDUCTION OF THE WORKFORCE AND LAYOFFS

Section 1 - When the Company does not have need for a job or work on a particular shift, the employee(s) who normally perform such work shall be laid off. Employees who are laid off shall have bumping rights as hereinafter set forth consistent with their seniority, physical fitness, and their skill and abilities to competently and efficiently perform the work of the classification into which they bump.

Section 2 - Where an employee bumps into either of the following classifications: Bander, Carpenter, he shall be given a trial period (not to exceed five (5) days) to demonstrate that he has the skill and ability to competently perform the work of the particular classification into which he bumps. Where an employee attempts to bump into any other classification he must have prior work experience in such classification in which event he shall be entitled to a trial period (not to exceed five (5) days) to demonstrate that he has the skill and ability to competently and efficiently perform the work of the classification into which he bumps. A bumping employee who does not have prior work experience in such classification or who has been given a trial period in such classification (either as a result of a prior bump or a job bid) and has not satisfactorily completed such trial period within twelve months of an attempted bump shall be deemed to be unqualified for such work and not eligible to bump into such job class.

Section 3 - Bumping employees must work on a shift and in the classification of the employee that he bumped, and at the rate of pay of the classification into which he bumped.

Section 4 - Production employees may not bump into the Maintenance Department.

Section 5 - In the event of a layoff, the employees involved and the Grievance Committee shall be notified at least twenty-four (24) hours prior to any reduction in the workforce.

Section 6 - When the need for the layoff, or any part thereof, ends and work resumes, the employees who were laid off for lack of work will be recalled to work as needed. Upon recall, employees affected by the layoff (those who were actually laid off as well as those who temporarily bumped into other jobs and/or shifts pursuant to the provisions of this Article) shall be returned to the job and shift that such employee had immediately prior to such layoff.

## ARTICLE 28 - TEMPORARY AND CASUAL EMPLOYEES

Section 1 - The Company may continue its present practice of hiring or using, at its discretion,

31

temporary or casual employees (including persons obtained from Manpower or similar agencies).

Section 2 - Temporary employees if kept beyond the ninety (90) calendar day probationary period shall be considered members of the Bargaining Unit, and except as herein provided, shall be subject to the terms and conditions of this Collective Bargaining Agreement.

(a)     Temporary employees may be hired for a period not to exceed ninety (90) calendar days. Such temporary employees shall, for their first ninety (90) days of employment, be considered probationary employees as provided in this collective Bargaining Agreement. Temporary employees shall not accumulate seniority while working as a temporary employee, however, if such temporary employee is hired by the Company such employee's original starting date (during his most recent engagement as a temporary employee) shall be treated as his/her date of seniority.

(b)     The hourly rate of pay for such temporary employees shall be a rate not less than the then current applicable minimum wage.

Such temporary employees shall not be entitled to any of the economic benefits of the Collective Bargaining Agreement.

Section 3 -

(a)     The Company agrees that its use of casual employees shall not produce the layoff of any Bargaining Unit employee.

(b)     Casual employees shall not accumulate seniority.

(c)     Casual employees shall not be entitled to any of the economic benefits of the Collective Bargaining Agreement.

Section 4 - Temporary and casual employees as defined in Section 2 and 3 above shall be subject to the payment of Union dues as provided in Article 2.

Section 5 - Temporary and casual employees shall be a minimum of 18 years old.

Section 6 - Shift preference shall be given to regular full time employees over temporary and casual employees.

**ARTICLE 29 - SICK DAY**

32

Section 1 - Employees on payroll are entitled to two (2) paid sick days per contract year after completion of such employee's first year of employment with the Company. An employee must use his two (2) sick days in the first four (4) unexcused absences.

Section 2 - Sick Day Option - see Article 30, Section 2.

Section 3 - Unused personal holidays and/or sick days from the prior calendar year will be paid to employees not later than by the second pay date after January 1st of the succeeding calendar year.

Employees who retire or resign their employment (with advance written notice to the Company) or who are discharged by the Company will be paid for such unused personal holidays and/or sick days within 20 days of employees' last day of work, except that those employees who are discharged for willful misconduct will not be entitled to any unused personal holidays and/or sick days.

## ARTICLE 30 - PERFECT ATTENDANCE AWARD

Section 1 - The attendance award plan which provides for two (2) hours of pay for each calendar month in which attendance is perfect will be continued. An employee who has nine (9) months of perfect attendance during the plan year shall receive a perfect attendance bonus of 125% of the bonus provided herein. An employee who has ten (10) months of perfect attendance during the plan year shall receive a perfect attendance bonus of 150% of the bonus provided herein. An employee who has eleven (11) months of perfect attendance during the plan year shall receive a perfect attendance bonus of 190% of the bonus provided herein. An employee who has twelve (12) months of perfect attendance during the plan year shall receive a perfect attendance bonus of 220% of the bonus provided herein. The plan year shall be defined as beginning on November 1 and ending on October 31. Payment of the attendance award for the said year will be in the same payroll period in which payment for the Thanksgiving holiday is paid.

Section 2 - Sick Day Option - Once during each perfect attendance bonus plan year (November 1 to October 31) an employee who has earned eight (8) hours during that particular bonus plan year shall have the option to use those eight (8) earned hours as a sick day during that plan year. The employee must exercise this option at the time the sick day is requested. Where such a sick day is requested, that absence will not be considered an occurrence for disciplinary purposes. If at the time that the sick day is requested, an employee has earned ten (10) hours or more, such absence will also not be considered as an absence under the Perfect Attendance Bonus Plan.

If at the end of the plan year an employee qualifies for the percentage bonus payment (an additional 25% for nine months to an additional 100% for 12 months), such percentage bonus payment will not be applied to the eight (8) hours of sick pay but will only be applied to the hours of pay that the employee is entitled to receive following the end of the bonus plan year.

## ARTICLE 31 - GRACE PERIOD

Employees shall be given a grace period for lateness on the job and at the work station which is non-cumulative and not to exceed a total of five (5) minutes per week.

33

## ARTICLE 32 - PROFIT SHARING-PLAN

The Company will continue in effect its present Profit Sharing Plan in accordance with the terms and conditions of the Plan, as they may from time to time be modified by Management.

## ARTICLE 33 - 401(k) PLAN

The Company will continue in effect a 401 K plan for its employees. Bargaining unit employees shall be permitted to participate in the said plan in accordance with the terms and conditions of such plan. The said plan, which will require Internal Revenue Service approval, will include a provision whereby the Company will agree to match 50% of an employee's annual contribution up to 8% of the particular employee's annual gross earnings.

## ARTICLE 34 - UNIFORMS

Section 1- The Company, at its expense, will provide uniforms (including laundering) through a uniform rental service of the Company's choosing. Such service will provide for each bargaining unit employee five (5) clean uniforms for a two-week period of time. Employees shall be required to wear such uniform at all times while at work. Failure to wear the uniform will subject an employee to appropriate discipline under Rule 32 (Failure to Wear Company-Provided Uniforms).

For the purpose of this Article, a "uniform" shall consist of any Company-supplied article of clothing.

> (a)     The Company, at its expense, will provide to each non-probationary employee six (6) T-shirts, imprinted as determined by the Company each calendar year. Probationary employees will receive their T-shirts upon successful completion of their probationary period. Such T-shirts are to be laundered by the employee.

Section 2 - Employees will be required to use reasonable care in using such uniforms. Employees will be required to compensate the uniform rental company for willful damage to such uniform.

<u>Section 3</u> - It is understood and agreed that employees are required to turn in to the Company their uniforms in good condition, reasonable wear and tear excepted, upon termination of employment. The Company shall have the right to withhold from any monies due and owing to the employee at the time of termination, twenty-five dollars ($25.00) for each uniform not returned in good condition.

## ARTICLE 35 - TERM OF AGREEMENT

<u>Section 1</u> - The terms and conditions of this Agreement shall continue in effect until midnight January 31, 2019. Thereafter, it shall be self renewing for yearly periods unless notice of desire to terminate or modify the Agreement is given in writing by either party to the other sixty (60) days prior to the expiration date.

<u>UNITED STEELWORKERS</u> *(handwritten)* 09-08

<u>COILPLUS PENNSYLVANIA</u>

Note: A schedule of hourly wage rates shall appear as Exhibit "A" to this Agreement. Any other necessary letters of understanding shall appear as additional exhibits.

## EXHIBIT A<sup>*</sup>

**Progression Schedule**

| | |
|---|---|
| **Starting Rate:** | Not less than \$2.50 below then current General Helper "B" hourly rate. |
| **After 30 Days:** | \$0.50 increase (in no event will the hourly rate exceed the current General Helper "B" rate). |
| **After Three Months:** | \$0.50 increase (in no event will the hourly rate exceed the current General Helper "B" rate). |
| **After Six Months:** | \$0.50 increase (in no event will the hourly rate exceed the current General Helper "B" rate). |
| **After Twelve Months:** | \$0.50 increase (in no event will the hourly rate exceed the current General Helper "B" rate). |
| **Eighteen Months:** | General Helper "B" Rate |

---

* General Helper "B" must hold X for all Company banding areas, as well as skid building, in order to mover into General Helper "A".; All General Helper A rates must hold "X" for all company banding areas as well as skid building and "B" rate slitter helper.

| Classification | | Classification Rate | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2/1/15 | 2/1/16 | 2/1/17 | 2/1/18 |
| General Helper* | "A" | $20.91 | $21.54 | $22.19 | $22.85 |
| | "B" | $18.14 | $18.68 | $19.24 | $19.82 |
| Bander / Carpenter | | $20.91 | $21.54 | $22.19 | $22.85 |
| Loader | | $21.67 | $22.32 | $22.99 | $23.68 |
| Material Handler | | $22.73 | $23.41 | $24.12 | $24.84 |
| 24" SL Op. | "A" | $22.70 | $23.38 | $24.08 | $24.81 |
| | "B" | $21.82 | $22.47 | $23.14 | $23.84 |
| 60" SL & 60" CTL Op. | "A" | $24.00 | $24.73 | $25.47 | $26.24 |
| | "B" | $22.77 | $23.46 | $24.16 | $24.88 |
| 60" SL Asst. Op. | "A" | $22.91 | $23.59 | $24.30 | $25.03 |
| | "B" | $22.10 | $22.77 | $23.45 | $24.15 |
| 60"CTL Asst. Op. | "A" | $22.71 | $23.39 | $24.09 | $24.82 |
| | "B" | $21.85 | $22.50 | $23.18 | $23.87 |
| 60" SL Helper | "A" | $22.10 | $22.77 | $23.45 | $24.15 |
| | "B" | $21.67 | $22.32 | $22.99 | $23.68 |
| 72" BL Op. | "A" | $24.27 | $24.99 | $25.74 | $26.52 |
| | "B" | $22.91 | $23.59 | $24.30 | $25.03 |
| 72" BL Asst Op. | "A" | $22.91 | $23.59 | $24.30 | $25.03 |
| | "B" | $22.10 | $22.77 | $23.45 | $24.15 |
| Headsetter | "A" | $23.01 | $23.70 | $24.41 | $25.14 |
| | "B" | $22.16 | $22.82 | $23.50 | $24.21 |
| Maintenance | "A" | $24.39 | $25.12 | $25.88 | $26.65 |
| | "B" | $23.38 | $24.08 | $24.80 | $25.55 |

* Maintenance employees shall receive a $.35/hr tool allowance which in included in the above schedule.

Above rates do not include adjustments for "X"'s in "Skill Jobs" as set forth in Exhibit "B".

# EXHIBIT B

### Coliplus Pennsylvania
### Disciplinary Form



Employee's Name: **DAVID BROWN**                    Date: **FEB.1,2015**

Position: **HEADSETTER**

Date of Hire: **AUG.3,2011**                    Supervisor: **TOM YANNARELLA**

**Discipline Taken:**

☐ Verbal Warning                    ☐ Written Warning - Suspension___ Intent to Term___
                                     Begin Date:__/__/___ End Date: __/__/___
☒ Written Warning                    ☐ Termination

☐ Other (Explain): _____

Reason: (attach separate sheet if necessary):    On Jan.29,2016 you set up WO#132912 INCORRECTLY

CAUSING DOWN TIME TO THE NEXT SHIFT.YOU SET UP 10 CUTS INSTEAD OF 9

ANY further occurances will result in more progressive disciplinary action

Rule or Policy Violated:    RULE#3 POOR WORK PERFORMANCE

Prior Disciplinary Record:    RULE #3 ON 1/25/16

Attendance write up

Signature of Supervisor: _Tom ayannarell_    Date: _2-1-16_

Signature of Witness: _____    Date: _2-1-16_

Signature of Employee*: _____    Date: _2-1-16_

*By signing this disciplinary form, the employee merely acknowledges that he or she
has read it. Signing does not imply agreement with its contents.

General Manager: _____    Date: _2/8/16_

President: _____    Date: _2/12/16_

| Seq. W/O# | Opr# | S/T | Disp | Customer | Coils | Brks | Weight | Footage | Time | Due Date | Next Customer |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 132908 | 010 | TOLL | SHIP | WORTHINGTON PA | 2 | 3 | 31548 | 26692 | 153 | 2/03/16 | 7500 coil |
| 40 133021 | 010 | SALE | SHIP | OMG | 3 | 3 | 76235 | 12659 | 81 | 2/01/16 | |
| 50 132990 | 010 | SALE | SHIP | WIREMOLD | 1 | 2 | 13272 | 1149 | 53 | 1/29/16 | |
| 60 133033 | 010 | SALE | SHIP | LINDAB | 1 | 1 | 10150 | 1437 | 28 | 2/01/16 | |
| 70 132993 | 010 | SALE | SHIP | WIREMOLD | 1 | 2 | 24603 | 2497 | 61 | 1/29/16 | |
| 80 132041 | 010 | SALE | SHIP | NEW STD EMA | 1 | 2 | 39190 | 5181 | 37 | 2/02/16 | |
| 90 132042 | 010 | SALE | SHIP | NEW STD EMA | 1 | 2 | 39070 | 5279 | 37 | 2/08/16 | |
| 100 132039 | 010 | SALE | SHIP | NEW STD EMA | 3 | 3 | 63210 | 4652 | 51 | 2/01/16 | ESS 2300 |
| 110 132924 | 010 | SALE | SHIP | NEW STD EMA | 4 | 4 | 81180 | 5965 | 63 | 2/04/16 | |
| 120 132912 | 010 | TOLL | SHIP | WORTHINGTON PA | 4 | 4 | 79485 | 65155 | 192 | 2/01/16 | |
| 130 133012 | 010 | SALE | SHIP | LINDAB | 1 | 1 | 17840 | 2535 | 46 | 2/01/16 | |
| 10 133011 | 010 | SALE | SHIP | LINDAB | 1 | 2 | 14462 | 4716 | 45 | 1/29/15 | |
| 20 132965 | 010 | SALE | NEXT | HAYDON CORPORAT | 4 | 4 | 151656 | 10921 | 98 | 2/01/16 | HAYDON CORPORAT |
| 30 132966 | 010 | SALE | NEXT | HAYDON CORPORAT | 4 | 4 | 151833 | 10932 | 98 | 2/02/16 | HAYDON CORPORAT |
| 40 132967 | 010 | SALE | NEXT | HAYDON CORPORAT | 4 | 4 | 152031 | 10948 | 98 | 2/02/16 | HAYDON CORPORAT |
| 50 133013 | 010 | SALE | SHIP | LINDAB | 1 | 3 | 25640 | 6868 | 64 | 2/02/14 | |
| 60 132965 | 020 | SALE | SHIP | HAYDON CORPORAT | 1 | | 94618 | | 98 | 2/01/16 | |
| 70 132966 | 020 | SALE | SHIP | HAYDON CORPORAT | 1 | | 94725 | | 98 | 2/02/16 | ESS 1500 |
| 80 132967 | 020 | SALE | SHIP | HAYDON CORPORAT | 1 | | 94832 | | 98 | 2/02/16 | |
| 90 133029 | 010 | TOLL | SHIP | WORTHINGTON PA | 2 | 2 | 38834 | 29007 | 93 | 2/01/16 | |
| 100 133047 | 010 | TOLL | SHIP | WORTHINGTON PA | 2 | 2 | 79080 | 52742 | 145 | 2/02/16 | |
| 110 133049 | 010 | SALE | SHIP | WIREMOLD | 1 | 1 | 24320 | 3883 | 53 | 2/01/16 | ESS 2300 |
| 120 133032 | 010 | SALE | SHIP | CMC | 4 | 4 | 102571 | 36446 | 130 | 2/10/16 | |
| 130 132882 | 010 | SALE | NEXT | WIREMOLD | 3 | 3 | 68600 | 11958 | 82 | 2/08/16 | WIREMOLD |
| 140 132915 | 010 | TOLL | SHIP | WORTHINGTON PA | 2 | 2 | 59512 | 42953 | 124 | 2/02/16 | |
| 150 132997 | 010 | SALE | SHIP | WIREMOLD | 1 | 1 | 11880 | 2224 | 37 | 1/29/16 | |

30 in #3
15 in #9

21.57

982%

**PRODUCTION REPORT**

WORK CENTER _60 USC_  SHIFT _C_  DATE _1.30.16_

SUPERVISOR _DD_  OPERATOR _GM_

MACHINE HOURS _21.2 (2.20)_ START ____  FINISH ____

# OF COILS _13_  ARBORS _14_  SET-UPS _4_

# OF CUTS _33_  TOTAL PIECES _91_  GROSS _16,80_

| WORKORDER | TICKET NO. | IN WEIGHT | CONSUMED WEIGHT | START TIME | END TIME | CUSTOMER NAME | BLANKING NUMBER PIECES | HEAD/TAIL SCRAP |
|---|---|---|---|---|---|---|---|---|
| 1 32004 | A861620 | 20430 | 20430 | 1100 | | NEW SD | 3 | |
| 2 | A361319 | 19860 | 19860 | | | | 3 | |
| 3 | A361571 | 9890 | 19890 | | 1220 | | 3 | |
| ◇ 132912 | A66011 | 19907 | 19907 | 1220 | | WAVE | 9 | |
| 72 BL G.I. | A361016 | 19797 | 19797 | | | | 9 | |
| 5 | A861017 | 19841 | 19841 | | | | 9 | |
| 7 | A361022 | 19946 | 19946 | | 300 | | 9 | |
| ◇ 133012 | A356230 | 17840 | 17440 | 300 | 420 | LINDAB | 10 | |
| ◇ 5304 | A356573 | 14443 | 14446 | 420 | 511 | LINDAB | 10 | |
| 10 132965 | A364203 | 37864 | 37864 | 511 | | HAYDON | 8 | |
| 11 | A362915 | 38063 | 38063 | | | | 2 | |
| 12 | A361834 | 57664 | 57664 | | | | 4 | |
| 13 | A364202 | 38063 | 38063 | | | | 4 | |
| 14 | | | | | | | | |
| Scal Goal | | | | | | | | |

LINEAR FOOTAGE _8690 1_

PADS ____
ARMS _111_

COMMENTS:
③ Horns full @ shift start (30m). ① PADS (15m) 132912
② Head w/o N3 for wave 132912 (25m)  ⑥ table push off broke (15m).
⑧ Rewrse Haydon w/ crane (25m).
⑨ (10m) top pad pulled out 132965.

FM-OP-07(04)

45m#1                                                                    822.

21.22
**PRODUCTION REPORT**

WORK CENTER ___60"SL___  SHIFT __B__         DATE __1-29-16__

SUPERVISOR _____          OPERATOR __5__

MACHINE HOURS __1.5°__ (1.90) START _____  FINISH _____

# OF COILS __13__   ARBORS _____  SET-UPS __2.86__

# OF CUTS __43__   TOTAL PIECES __113__   GROSS __15.9.14__

| WORKORDER | TICKET NO. | IN WEIGHT | CONSUMED WEIGHT | START TIME | END TIME | CUSTOMER NAME | BLANKING NUMBER PIECES | HEAD/TAIL SCRAP |
|---|---|---|---|---|---|---|---|---|
| 13290f | A364209 | 31,534 | 31,534 | FROM A SHIFT | 4:00 | WAVE | 10 | TOLL |
| 33081 | A356252 | 25,885 | 28,882 | 4:00 | | OMG | 8 | |
| | A356257 | 26,102 | 26,102 | | | | 8 | |
| | A356249 | 24,251 | 24,257 | | 5:05 | | 8 | |
| 13290f | A364206 | 13,873 | 13,272 | 5:05 | 5:45 | WM | 9 | |
| 33033 | A361602 | 10,150 | 10,150 | 5:45 | 6:15 | LINDA3 | 11 | |
| 32993 | A363424 | 24,603 | 24,603 | 7:00 | 7:30 | CM | 10 | |
| 3204 | A361884 | 39,198 | 39,190 | 8:00 | 8:55 | NEW STD | 2 | SKM |
| 32042 | A36159 | 39,020 | 39,020 | 8:55 | 9:35 | NEW SC) | 2 | |
| 32039 | A363951 | 20,920 | 20,900 | 9:40 | | NEW SCO | 3 | |
| | A363852 | 21,150 | 21,150 | | | | 5 | |
| | A36395 | 21,140 | 21,140 | | 10:35 | | 3 | SKM |
| 32924 | A363949 | 21,000 | 21,000 | 10:55 | | NRUS2) | 3 | |
| 3Dai Goal | | | | | | | | |

LINEAR FOOTAGE ___58400___                        PADS _____
                                                   ARMS __IIII__

COMMENTS: 7-#1  NO HEAD  6:15 to 7:00

FM-OP-07(04)

```
CSC310RT    COILPLUSPA  TVAIL
Work Order#: 132912 Opr#: 010 TOLL
Work Center: SL 60SL  60" SLITTER (STAMCO)
Salesman   : B01 Kathy Borrell
```

***** Customer In

```
--Customer Name  / Number-- -Purchase Order #--- ------Part Number-------- --
1 WORTHINGTON PA  / 00025880 042845001          190248HD                  AC
```

***** Product Infor

**Material Type:** GA

```
--Dimensions--- Cuts Thick Tol. Width Tolr. Trim ID    Qty.Ord    Opr. Dest.
1 .0095X04.055XC  9 +.0010-.0000 +.005-.005  Y   20    77,600     WORTH
     36.495 Total Width                             77,600 Total
```

| Disp | Thick. Range | Width Range | Remarks: |
|------|-------------|-------------|----------|
| SHIP | .0095-.0105 | 4.050- 4.060 | 5 COILS MAX PER SKID    SPLICES OK |

```
                                        MULT TAGS MUST BE IN ID OF COIL *** 4 BAND
                                        O'CLOCK POSITION. DO NOT USE ENVELOPES.US
                                        D WEIGHT* METAL SKIDS=NO PAPER ON SKIDS /
                                        VE CENTER DECKBOARD** METAL SKIDS PREFERRE
```

***** Master Coil & Producti

| Coil No | Dimensions | Weight | Material Specifications | PIW Paint | Locatio |
|---------|-----------|--------|------------------------|-----------|---------|
| A361011 | .0096X37.375XC | 19907 | GA | 532 | 4B |
| A361016 | .0096X37.375XC | 19797 | GA | 529 | 5C |
| A361017 | .0096X37.375XC | 19841 | GA | 530 | 6C |
| A361022 | .0096X37.375XC | 19940 | GA | 533 | 4C |

```
            Total Wt.  79485
```

Operator: (signature)     Date: 1.30.16            ***** Quality Insps

```
Coil Number  A361011
Lead Thickness:Drive_____ Center_____ Work_____ Break Thickness:Drive_____

Coil Number  A361016
Lead Thickness:Drive_____ Center/_____ Work/_____ Break Thickness:Drive_____

Coil Number  A361017
Lead Thickness:Drive_____ Center/_____ Work/_____ Break Thickness:Drive_____

Coil Number  A361022
Lead Thickness:Drive_____ Center_____ Work_____ Break Thickness:Drive_____
```

Width:  (1) 4.055  4.054 x 9    4.055_____ 4.055_____ 4.055_____ 4.C
             4.055           4.055



**EdgeMaster**
American Shear Knife
Division of ASKO, Inc.
Support: 800-321-1310 x278
EdgeMaster@askoinc.com
www.askoinc.com

|||||||||||||

## ORDER DATA

| | | | |
|---|---|---|---|
| Job Number | | 132912 | Order Description |
| Order Number | | | User |

Edge

## SETUP DATA

| | | | |
|---|---|---|---|
| Setup Orientation | | Center | Customer Name | None |
| Head | | Head 2 on 62 Slitter | Setup Method | Normal |

## COIL DATA

| | | | |
|---|---|---|---|
| Material Type | | Steel | Coil Length | 0.000 |
| Coil Width | | 37.375 | Coil Yield | 97.62% |
| Coil Weight | | 0.000 | Percent Scrap | 2.38% |
| Weight Per | | 0.000 | Total Weight Cut | 0.000 |
| Material Thickness | | 0.0090 | Inboard Side Scrap | 0.444 |
| Tensile Strength | | 50 | Outboard Side Scrap | 0.444 |
| Clearance Percent | | 0.000 | Vertical Clearance | 0.000 |

## SUMMARY OF SLITTING ENTRIES

| Ordered Width | Built Width | Knives | Clearance | # Of Mults | Order Number | Weight |
|---|---|---|---|---|---|---|
| 4.054 | 4.054 | 0.250 | 0.001 | 9 | | 0.00 |

## TOOLING INVENTORY STATUS

| Knives | Required | Remaining | Knives | Required | Remaining |
|---|---|---|---|---|---|
| 0.250 Knife | 20 | 80 | 0.375 Knife | 0 | 100 |
| 0.125 Knife | 0 | 100 | 0.500 Knife | 0 | 78 |

| Spacers | Required | Remaining | Spacers | Required | Remaining |
|---|---|---|---|---|---|
| 3.000 Spacer | 33 | 9 | 0.066 Spacer | 0 | 69 |
| 1.500 Spacer | 1 | 59 | 0.058 Spacer | 2 | 69 |
| 0.750 Spacer | 11 | 65 | 0.054 Spacer | 10 | 71 |
| 0.400 Spacer | 13 | 54 | 0.052 Spacer | 10 | 74 |
| 0.200 Spacer | 12 | 65 | 0.051 Spacer | 2 | 75 |
| 0.100 Spacer | 12 | 43 | 0.0505 Spacer | 0 | 7 |
| 0.082 Spacer | 0 | 77 | 0.050 Spacer | 11 | 75 |

# EXHIBIT C

**Coilplus Pennsylvania**
**Disciplinary Form**



Employee's Name: **DAVE BROWN**                    Date:    **FEB.4,2016**

Position:          **HEADSETTER**

Date of Hire:      **AUG.3,2011**                  Supervisor:   **RICH GORMAN**

Discipline Taken:

☐ Verbal Warning                    ☐ Written Warning - Suspension X
                                       Begin Date:__/__/____  End Date: __/__/____
☐ Written Warning                   ☐ Termination

☐ Other (Explain): _____

Reason: (attach separate sheet if necessary):    On Feb.3,2016 Dave Brown shut down the 60"slitter

for 60 mins. This is unacceptable,and will not be tolerated.Any further occurances with in 12 months

of this date will result in your termination.

Rule or Policy Violated:   Rule#3-poor work performance

Prior Disciplinary Record:      Rule #3 on 1/25/16 and 2/1/16

attendance write up.

Signature of Supervisor: _____    Date:  _2/4/16_

Signature of Witness: _____       Date:  _2/4/16_

Signature of Employee*: _____     Date:  _2/4/16_

*By signing this disciplinary form, the employee merely acknowledges that he or she
has read it. Signing does not imply agreement with its contents.

General Manager: _____Date:  _2/8/16_

President: _____    Date:  _2/6/16_

60 m #12
50 m #3
56 m #1

15.31

59%

**PRODUCTION REPORT**

WORK CENTER _60"SL._  SHIFT _B_  DATE _2-3-16_

SUPERVISOR _____  OPERATOR _3m_

MACHINE HOURS _1.24(1.40)_  START _____  FINISH _____

# OF COILS _2_  ARBORS _8_  SET-UPS _____

# OF CUTS _50_  TOTAL PIECES _68_  GROSS _____

| WORKORDER | TICKET NO. | IN WEIGHT | CONSUMED WEIGHT | START TIME | END TIME | CUSTOMER NAME | BLANKING NUMBER PIECES | HEAD/TAIL SCRAP |
|---|---|---|---|---|---|---|---|---|
| 133100 | A362661 | 20,200 | 20700 | 2:50 | 4:25 | WAUK | 9 | |
| 133 105 | A363005 | 24 750 | 24 750 | 4:25 | 5:25 | WM | 22 | |
| 133 04 | A362639 | 16 100 | 16 100 | 5:25 | 6:05 | MBS. DBIS STANLEY | 2 | |
| 22896 | A35 9235 | 24 989 | 24 989 | 7:00 | 8:30 | WM | 6 | |
| 133036 | A361900 | 37,040 | 37 040 | 8:50 | | CPC | 6 | |
| | A361455 | 37 080 | 37 080 | | 10:15 | | 6 | |
| 132529 | 362246 | 38 310 | 28 910 | 10:15 | | CPC | 5 | |
| | | | | | | | 5 | |
| | | | | | | | 5 | |
| | | | | | | | 5 | |
| | | | | | | | 5 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

72 BL Goal

60si Goal

PADS _____
ARMS _HHH_

LINEAR FOOTAGE _331.52_

COMMENTS: 2:00 to 3:50 DEAD IN THE WATER EVERYTHING FULL

NASCO TRAINING & PACKING 60mins
PIZZA PARTY 20min.

6:05 to 7:00 NO HEAD

#5 500 MIN NO HEAD, HEAD SETTER WENT HOME LEFT DEAD
LAZOR NOT READING IN TIGHT LINE
NOT READING THE FOOTAGE 60 60 FEET

FM-OP-07(04)

# EXHIBIT D

## Collplus Pennsylvania
## Disciplinary Form



| Employee's Name: | David Brown | | Date: | Feb.5,2016 |

Position:        Headsetter

Date of Hire:    Aug.3,2011                              Supervisor:   Rich Gorman

**Discipline Taken:**

☐ Verbal Warning                        ☐ Written Warning - Suspension___ Intent to Term_ X

☐ Written Warning                       Begin Date:__/__/____ End Date: ___/__/____
                                        ☒ Termination

☐ Other (Explain):   Employee is suspended 5 days pending Termination

Reason: (attach separate sheet if necessary):   On Feb.4,2016 Dave Brown slowly made set-ups

causing down-time to the 60"Slitter, He decided also to skip WO#S Without telling his supervisor or

co-workers causing more down-time, I gave him a DIRECT order to set-up Lindab,He failed to do so

Rule or Policy Violated:   Rule#3 and Rule#30. Poor work performance / Insubordination

Prior Disciplinary Record:   Rule#3 on 1/25/16, 2/1/16 2/4/16

Attendance write up

Signature of Supervisor:  _Rich Gorman_                  Date:   _2/5/16_
                          _union comm._
Signature of Witness:     _Jim Yus_                       Date:   _2-5-16_

Signature of Employee*: _____              Date:   _____

*By signing this disciplinary form, the employee merely acknowledges that he or she
has read it. Signing does not imply agreement with its contents.

General Manager:          _____            Date:   _____
President:                _____            Date:   _2/12/16_

1 of 1                                                                    FM-HR-07(02)

# PRODUCTION REPORT

WORK CENTER _60" Ω._   SHIFT _B_   DATE _2-4-16_

SUPERVISOR _____   OPERATOR _____

MACHINE HOURS _1.53_   START _____   FINISH _____

# OF COILS _11_   ARBORS _13_   SET-UPS _5_

# OF CUTS _____   TOTAL PIECES _____   GROSS _____

| WORKORDER | TICKET NO. | IN WEIGHT | CONSUMED WEIGHT | START TIME | END TIME | CUSTOMER NAME | BLANKING NUMBER PIECES | HEAD/TAIL SCRAP |
|---|---|---|---|---|---|---|---|---|
| 132884 | A361896 | 23,230 | 23,230 | 3:15 | 3:55 | WIREMOLD | 19 | |
| 133138 | A363112 | 22,700 | 22,700 | 3:55 | | CORNELL | 8 | |
| | A363801 | 16,980 | 16,980 | | 5:10 | | 8 | |
| 132898 | A363880 | 19,312 | 19,312 | 5:25 | 6:10 | WM | 6 | |
| 133061 | A359831 | 19,081 | 19,081 | 6:25 | 6:50 | SFS | 14 | |
| 133113 | A | | | | | GNDAB | 11 | |
| | | | | | | | 11 | |
| | | | | | | | 11 | |
| 132871 | A363604 | 17,620 | 17,620 | 7:30 | | SCAN FIN | 20 | |
| | A363605 | 25,490 | 25,490 | | | | 20 | |
| | A363600 | 17,790 | 17,790 | | | | 20 | |
| | A363601 | 17,390 | 17,390 | | 9:30 | | 20 | |
| 132868 | A361960 | 10,956 | 10,956 | | | CMC | 9 | |
| | A362584 | 22,002 | 22,002 | | | | 9 | |
| | | | | | | | 9 | |

LINEAR FOOTAGE _50369_

PADS

ARMS _IIII_

COMMENTS:

3:55 to 4:15    NO HEAD    20 MINS
5:10 to 5:25    "    "     25 MINS
6:10 to 6:25    "    "     15 MIN

WAS TO
BE LINDAB #6   WRONG HEAD SET 6:50 to 7:30   40 MINS

WAS TO BE
LINDAB    9:30 to 9:45   NO HEAD SET, SET Ω BOBS DOWN
          15 MINS

FM-OP-07(04)

I decided to put CMC IN.
COULD NOT WAIT ANY
LONGER.  DD